BELZ INVESTMENT CO., INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7079-77.    Filed September 27, 1979.

*Tommy H. Jagendorf,* for the petitioner.
*Wesley J. Lynes,* for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in, and additions to, the Federal corporate income tax of petitioner:

| Taxable year[1] | Deficiency | Addition to tax under sec. 6653(a)[2] |
|---|---|---|
| 1970 | $102,568.94 | $5,128.45 |
| 1973 | 278,221.25 | 13,911.06 |

After concessions by both parties,[3] the three issues which remain for the Court's decision are:

(1) Whether payments made in 1973 by petitioner's subsidiary pursuant to a lease agreement executed in a sale-leaseback with option to repurchase transaction relative to a Holiday Inn were deductible as rental expenses or were nondeductible as amount attributable to the repurchase price;

(2) To what extent petitioner, as lessor of real property, is required to include in income an amount received in settlement of a claim filed in the bankruptcy proceeding of the lessee of the real property; and

(3) Whether petitioner is liable for additions to tax under section 6653(a) for either taxable year in issue.

---

[1]Petitioners filed corporate income tax returns on a calendar year basis.

[2]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.

[3]Accordingly, a decision pursuant to Rule 155, Tax Court Rules of Practice and Procedure, will be necessary in any event.

The deficiency and addition to tax for taxable year 1970 result from respondent's adjustments concerning 1973. These adjustments eliminated the net operating loss petitioner claimed to have sustained in 1973 and which petitioner carried back to 1970. Whether petitioner sustained a net operating loss in 1973, which was available to be carried back to 1970, depends upon the resolution of the above issues.[4]

### FINDINGS OF FACT

Some of the facts were stipulated and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Belz Investment Co., Inc. (hereinafter petitioner), is a corporation which was incorporated on December 29, 1955, under the laws of the State of Tennessee. Petitioner had its principal place of business in Memphis, Tenn., when the petition in this case was filed.

During the taxable years in issue, petitioner filed consolidated corporation income tax returns with the following corporate subsidiaries, all of which had their principal places of business in Memphis, Tenn.:

| Subsidiaries | Date incorporated |
| --- | --- |
| Thomas Development Co | Nov. 9, 1962 |
| White Station Road Corp | Apr. 17, 1968 |
| Poplar X-Way Corp | May 10, 1966 |
| Expressway Motel Corp | May 23, 1963 |
| Gateway Development Corp | Aug. 15, 1962 |

### "Rental"[5] Payments

In 1967, Holiday Inn of America, Inc. (hereinafter Holiday), completed construction of a motel in White Plains, N.Y., for Expressway Motel Corp. (hereinafter Expressway). This motel, later to be known as the Holiday Inn of White Plains, N.Y., was constructed on land which Expressway had previously leased from a third party under a 99-year lease.[6] This lease provided for

---

[4]The concessions made by the parties on the other issues reduce, but do not eliminate, the net operating loss claimed by petitioner to have been sustained in 1973.

[5]The terms "rent," "rental," "lease," "lessee," "lessor," "sale," and "option," as used in the findings of fact, are not intended to indicate the character of the transaction in question, but instead are used solely for purposes of clarity and convenience.

[6]Expressway leased the property from the third party in or about 1963.

initial monthly rental payments of $1,000 and subsequent monthly payments of $1,200. Land adjacent to the leasehold was owned by Expressway in fee simple. This adjacent land was used as a parking lot for the motel. Expressway operated the motel for approximately the second half of 1967.

Prior to completion of the motel, Expressway became dissatisfied with the time delays involved in completing the motel and with the quality of workmanship with which the motel was built. During the course of negotiations with Holiday concerning these problems, and, from Expressway's viewpoint, as a way of solving them, Expressway agreed to sell the motel to, and simultaneously lease it from, Holiday. The property involved included the motel itself, Expressway's rights under the ground lease, and the land adjacent to the motel which Expressway held in fee simple. Specific evidence was not introduced as to how Expressway originally intended the motel to be owned and operated.

Expressway and Holiday entered into an agreement for a concurrent sale and leaseback of the motel property effective as of January 1, 1968. Expressway conveyed its right, title, and interest in the property to Holiday for $1,502,000, of which amount approximately $35,000 represented a profit for Expressway.[7] Concurrently, Expressway leased the motel property from Holiday pursuant to a lease agreement (hereinafter agreement), which required Expressway to pay Holiday annual rent in the amount of 25 percent of gross annual guestroom rentals and 5 percent of gross annual restaurant- and bar beverage revenue. No minimum rental provision was contained in the agreement. During the years 1968 through 1973, the following amounts were generated pursuant to the percentage rental formula:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1968 | $224,260.02 | 1971 | $265,073.28 |
| 1969 | 247,371.72 | 1972 | 273,481.86 |
| 1970 | 261,719.35 | 1973 | 276,835.72 |

The agreement further provided: (1) For a term of January 1, 1968, to April 30, 1987, with Expressway having the right to renew the agreement on the same terms and conditions for three additional terms of 10 years each; (2) that Holiday warranted

---

[7] The sales contract was not introduced into evidence. Petitioner, in his reply brief, sets forth what purports to be the contract. This, of course, is not evidence and cannot be, and was not, considered.

the premises for a period of 1 year against defects in workmanship or materials; (3) that Expressway was to maintain the premises and to pay all charges for utilities, taxes, and assessments; (4) that Expressway assumed, with certain exceptions, the obligations of "tenant" under the ground lease executed between Expressway and the third party and assigned by Expressway to Holiday, including the right to purchase the property;[8] (5) that Expressway was to provide and keep in force personal injury insurance, fire insurance, and extended coverage insurance for the property, said insurance to be payable to Expressway, Holiday, and any mortgagee according to their respective interests; (6) that if the premises were partially or totally destroyed and Holiday decided not to rebuild, then Expressway could utilize fire insurance proceeds to rebuild and deduct from the rental amounts otherwise due, any amount expended in excess of the insurance proceeds; (7) that if the premises were destroyed and neither Holiday nor Expressway decided to rebuild, then the agreement was terminated, Expressway was to receive the insurance proceeds in excess of Holiday's outstanding first mortgage balance, and Holiday, at Expressway's election, was to quitclaim and assign the property to Expressway; (8) that if damages were awarded as a result of condemnation of all or a portion of the motel property, then Expressway was entitled to all damages awarded with respect to its leasehold interest plus two-fifths of the damages awarded with respect to Holiday's fee and ground lease interests, while Holiday was only entitled to three-fifths of the damages awarded with respect to its own interests; and (9) that if the motel property was so substantially taken by condemnation as to make the premises unsuitable for continuing motel operations, then the agreement was terminated, Expressway was to receive the condemnation awards in excess of Holiday's outstanding first mortgage balance, and Holiday, at Expressway's election, was to quitclaim and assign the remaining property to Expressway. The agreement also provided:

### OPTION OF PURCHASE

16. At any time after this * * * Agreement has been in effect for a period of nine years and ten months and upon two months written notice, * * * the

---

[8] The excepted obligations were not identified, and the ground lease was not introduced into evidence. It appears, however, that Expressway was not obligated to pay the ground rent.

Lessee shall have the option to purchase the subject premises for the purchase price of $1,502,000.00 reduced by the excess, if any, of the gross rental payments made by Lessee * * * over and above the sum of $1,438,000.00, provided, however, if said option is exercised prior to the time that this * * * Agreement has been in effect for a period of ten years there shall be substituted for the $1,438,000 above, the sum of (a) the number of months this * * * Agreement has been in effect multiplied by $11,814.58 and (b) the number of months this * * * Agreement has been in effect since April 1, 1975, if any, multiplied by $200.00. Said purchase price shall likewise be reduced by the amount of any condemnation proceeds received by the Lessor * * * and by the amount of any expenses incurred by Lessee * * * . Title to said premises shall be in the same condition as at the inception of this * * * Agreement, except for the following matters:

(i) the obligations under the first mortgage * * * , to be then current, which shall be assumed by the Lessee, with a corresponding credit against the adjusted purchase price aforesaid for the then principal balance of the indebtedness assumed;

\* \* \* \* \* \* \*

If the adjusted purchase price as determined * * * shall be less than the then remaining balance of the * * * first mortgage, * * * then Lessor shall make a prepayment of principal to * * * mortgagee so as to reduce the remaining principal balance to an amount equal to the adjusted purchase price.

Lessor specifically covenants and agrees not to encumber or permit to be encumbered the subject premises in any manner which would derogate from Lessee's option to purchase * * * , nor shall any additional mortgages be placed against the premises, and any purported action to the contrary shall be null and void.

In addition to the aforementioned agreement, petitioner, or one of its subsidiaries,[9] and Holiday entered into three other leasing transactions (hereinafter other transactions), involving motel property. In these other transactions, Holiday was the lessee and petitioner the lessor. No evidence was introduced that these other transactions also involved a sale and leaseback of the motel property.

The agreement executed for the motel property in White Plains and the lease agreements executed in the other transactions are similar in some respects. They are similar as to: (1) Initial term;[10] (2) option of lessee to renew the lease involved for three additional periods of 10 years each; (3) annual percentage rental formula of 25 percent of gross annual guestroom rentals

---

[9]For convenience, reference will only be made to petitioner.

[10]The agreement provided for an initial term of 19 years, 4 months. The lease agreements executed in the other transactions all have initial terms of 20 years.

and 5 percent of gross annual restaurant and bar beverage revenue;[11] (4) absence of a minimum rental provision; and (5) lessee's responsibilities concerning taxes, maintenance of the premises, utilities, and insurance. Four provisions of the agreement, however, were considerably different from the lease agreements executed in the other transactions. These were: (1) The purchase option; (2) the 1-year warranty; (3) the provision covering destruction of the premises; and (4) the provision covering condemnation proceeds.

The most significant difference was the option to purchase granted in the agreement. None of the lease agreements executed in the other transactions contained similar options. The option purchase price set forth in the agreement equaled the amount which Holiday paid to Expressway when Holiday purchased the motel property in 1968. The option purchase price and the $1,438,000 amount were agreed to by Expressway and Holiday following negotiations. The negotiations were conducted on an arm's-length basis and, as can be expected in such circumstances, both Holiday and Expressway sought the best terms available. The earliest date on which Expressway could have exercised the option to purchase was November 1, 1977. As of the time of the trial of this case, March 15, 1978, Expressway had neither exercised the option nor given the required notice.

The agreement's warranty provision differed from that contained in the lease agreements executed in the other transactions in that the latter only provided that for the first year the lessor would "reasonably endeavor" to enforce all warranties of the general contractor concerning defects in workmanship and materials, but that the lessee's occupancy of the premises constituted both an acceptance of the premises in the condition they were then in and a waiver of any claims the lessee may have had against petitioner for the condition thereof.

The "destruction of premises" provisions in the lease agreements executed in the other transactions neither allowed the lessee, Holiday, to rebuild the premises if the lessor chose not to rebuild nor provided that the lessee was entitled to the insurance proceeds in excess of the outstanding first mortgage balance.

---

[11] Such a percentage rental formula is standard in leases executed by Holiday and is apparently common in the motel business.

The "condemnation" provision provided that the lessor and lessee were only entitled to their respective damages.

Holiday reported the amounts received from Expressway pursuant to the percentage rental formula as rental income on its Federal corporate income tax returns. All of the amounts paid have been credited to a rental income account in Holiday's books and records. Holiday also took depreciation deductions for the motel property.

For the years 1968 through 1973, petitioner deducted as a business expense the amounts paid by Expressway to Holiday pursuant to the percentage rental formula. As of the end of 1972, the sum of such amounts totaled $1,271,906.23. Expressway paid $276,835.72 to Holiday in 1973, thereby causing the total of amounts paid to exceed the negotiated $1,438,000 amount by $110,741.95. Respondent, in his notice of deficiency, disallowed a deduction for this $110,741.95 on the ground that it was part of the purchase price.

*Bankruptcy Claim*

During 1969, petitioner received requirement drawings from Miller-Wohl Co., Inc. (hereinafter Miller-Wohl), for the construction on property owned by petitioner of three stores for the use of Welles Department Stores, a discount department store chain owned by Miller-Wohl. The stores were designed specifically for occupancy by Welles. The three stores were to be located on Summer Avenue, South Third Street, and Mendenhall Road, Memphis, Tenn. Following negotiations, petitioner and Miller-Wohl entered into three leases dated September 26, 1969 (Summer Avenue), October 10, 1969 (South Third Street), and August 11, 1970 (Mendenhall Road).

In the three leases, all of which were subject to petitioner's being able to obtain satisfactory financing, petitioner agreed to construct the three stores for Miller-Wohl, and Miller-Wohl agreed to lease the stores for a term of 30 years and to pay both a fixed rental plus a percentage rental based on gross sales. The terms of the leases required Miller-Wohl to pay real estate taxes, insurance, and some maintenance expenses on the store properties. Each lease also provided:

> In the event * * * [petitioner] terminates this Lease or without terminating this Lease reenters the premises, as herein provided, * * * [petitioner] may elect by written notice to * * * [Miller-Wohl] given at any time within one

hundred twenty (120) days following such termination or reentry to be indemnified for loss of rent by a lump sum payment representing the difference between the amount of rent which would have been paid in the absence of default for the remainder of the term and the fair rental value of the premises for the remainder of the term, estimated as of the date of the termination. * * *

* * * * * * *

In the event of a default or threatened default by * * * [Miller-Wohl] of any of the terms, provisions, convenants, conditions, rules and regulations of this Lease, * * * [petitioner] shall have the right to injunction and the right to invoke any remedy permitted to * * * [petitioner] in law or in equity. All remedies available to * * * [petitioner] are declared to be cumulative and concurrent. No termination of this Lease nor any taking or recovering of possession of the premises shall deprive * * * [petitioner] of any of its remedies or actions against * * * [Miller-Wohl] and * * * [Miller-Wohl] shall remain liable for all past or future rent, including all additional rent, taxes, insurance premiums and all other charges and rent payable by * * * [Miller-Wohl] under this Lease, during and for the balance of the original term hereto, nor shall the bringing of any action for rent or other default be construed as a waiver of the right to obtain possession of the premises.

Miller-Wohl had no obligation under the lease to remodel in the event of a default.

Financing for the stores on Summer Avenue and South Third Street was provided by Union Commerce Bank, Cleveland, Ohio (hereinafter bank), in the amount of $1,150,000 for each store. To repay the loans, petitioner executed two promissory notes to the order of the bank in the amount of $1,150,000 together with interest of 10 percent per annum. Each of the promissory notes provided, inter alia:

Notwithstanding any provision herein or in the Deed of Trust securing this Note to the contrary, it is hereby expressly understood and agreed that in the event the holder hereof shall at any time take action to enforce the collection of the indebtedness evidenced hereby and secured by said Deed of Trust, such holder will proceed first to foreclose the said Deed of Trust instead of instituting suit upon this Note and if, as a result of such foreclosure and sale of the property described therein, a lesser sum is realized therefrom than the amount then due and owing under this Note and Deed of Trust, such holder will never institute any action, suit, claim or demand in law or in equity against the undersigned for or on account of such deficiency, provided, however, that nothing in this paragraph contained shall in any way affect or impair the lien of the said Deed of Trust nor any representation or warranty of title made therein by the undersigned, all of which shall remain in force and shall inure to the benefit of the holder, as beneficiary thereunder.

This Note is given for a loan in the amount above, is secured by an Assignment of Lease and a Deed of Trust of even date herewith on real estate

in Shelby County, Tennessee, but shall be construed by the law of the State of Ohio.

To secure payment of these two promissory notes, petitioner also executed deeds of trusts on the Summer Avenue and the South Third Street properties in favor of the bank. Each of the deeds provided, inter alia:

(A) That, subject to, but together with all of petitioner's rights, title, and interest in the respective lease agreement, petitioner does hereby sell, transfer, and convey to Mid-South Title Co., Inc., as trustee, to have and hold in trust, in fee simple, the land, buildings, fixtures, rights-of-way, etc., and—

All awards in respect to any taking of any of the foregoing and the proceeds of all insurance policies in respect of any damage to or destruction of the foregoing, subject to the provisions of this deed of trust.

(B) That petitioner agrees (1) to perform all of its covenants and agreements under the lease agreement with Miller-Wohl; (2) not to collect the rents accruing thereunder for more than 1 month in advance without the written consent of the bank; and (3) not to amend, modify, or cancel the lease agreement without the written consent of the bank.

(C) That petitioner was to maintain or cause to be maintained casualty and general public liability insurance on the property in specified amounts. It was further provided that casualty insurance proceeds were to be paid to the bank and the bank, in its discretion, could apply such proceeds for restoration of the property or apply them against the indebtedness secured by the deed of trust. Condemnation awards were also to be paid to the bank, and they were similarly subject to the bank's discretion.

The deeds of trust also contained provisions similar to that quoted above from the notes limiting the beneficiaries' recourse in the event of default to the properties themselves and protecting the grantor from being sued for any deficiencies.

Financing for the store on Mendenhall Road was provided by Northwestern Mutual Life Insurance Co., Milwaukee, Wis., in the amount of $1,450,000. To repay this loan, petitioner executed a promissory note to the order of the insurance company in the amount of $1,450,000 together with stated interest of 9 percent per annum plus a "bonus interest" amount which was computed on the basis of a percentage of the gross income, subject to certain exclusions, derived from operation of the property.

To secure payment of this promissory note, petitioner executed a deed of trust on the Mendenhall Road property in favor of the insurance company. The terms thereof were similar to those contained in the deeds of trust executed on the Summer Avenue and South Third Street properties, including conveyance of petitioner's interest in the lease agreement for the store property. Although this deed did not specifically provide that petitioner would not collect rents for more than 1 month in advance, it did provide that petitioner "shall continue to manage said premises as owners and collect all income arising therefrom, but only as it accrues."

Both the note and deed of trust to Northwestern also contained provisions limiting the holder's recourse in the event of default to the property itself and protecting petitioner from being sued for any deficiency.

Petitioner completed construction of the buildings on Summer Avenue and South Third Street in October of 1970, and of the building on Mendenhall in June 1972.

On September 28, 1972, Miller-Wohl filed a petition for an arrangement under chapter XI of the Bankruptcy Act in the United States District Court for the Southern District of New York. The petition requested the court to stay all Miller-Wohl's creditors from taking proceedings against and interfering with Miller-Wohl's property. On September 28, 1972, a referee in bankruptcy entered an order which enjoined all creditors and landlords of Miller-Wohl from interfering with any property of which Miller-Wohl was in possession. On December 26, 1972, a referee in bankruptcy entered an order which enjoined all creditors and landlords of "Welles" stores from interfering with any property of which the "Welles" stores were in possession.

By letter dated February 7, 1973, Miller-Wohl advised petitioner that as of that date, the lease for the South Third Street property was being rejected, and the property was being vacated. Although similar letters pertaining to the other two properties were not introduced, it is clear that Miller-Wohl did vacate these properties.

Information which petitioner received concerning the financial problems of Miller-Wohl was transmitted to the bank and the insurance company. Petitioner also attempted to locate tenants who would lease the three properties after the Welles

department stores vacated them. Petitioner was unsuccessful in this effort because of the special design of the stores.

By petition dated June 18, 1973, petitioner filed a proof of claim in the bankruptcy proceeding of Miller-Wohl. The petition contained a claim for $2,667,412.09[12] consisting of an administrative claim in the amount of $185,756.47 and a general claim in the amount of $2,481,655.62. The petition recited that the claim was for "rental for certain real property."

The administrative claim was for amounts which petitioner claimed as due for the period from the date Miller-Wohl ceased paying rent to the date of the District Court's order rejecting and disaffirming the three leases (April 1973). The general claim was for amounts which petitioner claimed as due for the 3-year period subsequent to the date of the District Court's order. The largest portions of the administrative claim ($112,949.24) and of the general claim ($1,764,812.52) were for amounts under the minimum rental provisions of the leases. The claims also included amounts for real estate taxes, common area maintenance, building maintenance, utilities, and insurance.

Subsequent to its filing, petitioner and Miller-Wohl held meetings concerning petitioner's claim. During these meetings, discussions were held as to what it would cost petitioner to remodel the properties in order to make them as valuable as rental property as they were when Miller-Wohl leased them.

By letter dated August 22, 1973, petitioner confirmed to Miller-Wohl petitioner's offer to settle its claim for a cash payment of $750,000, of which amount $60,037.46 was for the administrative claim and $689,962.54 was for the general claim. The letter further provided that if the offer was accepted by Miller-Wohl and authorized by the referee in bankruptcy, then at the closing of the settlement, petitioner would deliver to Miller-Wohl satisfactory evidence that petitioner was "owner of the landlord's interest under the lease, and that * * * [petitioner had] the right, power and authority to make the offer made * * * and to release * * * [Miller-Wohl], from any and all claims with respect to such leases."

Miller-Wohl accepted the settlement offer, the District Court authorized Miller-Wohl to pay the $750,000 amount, and the

[12]The administrative claim and the general claim in the petition were erroneously totaled as $2,567,412.09.

money was paid to petitioner. Petitioner and Miller-Wohl also executed releases by which each party released the other from the three leases. Petitioner accounted for the $750,000 by debiting the amount to its First National Bank account and by crediting it to a "contingent liabilities-reserve, Miller-Wohl bankruptcy." The general claim was allocated among the three properties in equal amounts.

Prior to September 1973, petitioner and Union Commerce Bank had agreed to modify the terms of the two promissory notes such that petitioner was paying on the notes on an "interest-only" basis at the reduced rate of 8 percent per annum. Petitioner also was paying the real estate taxes, insurance, and maintenance expenses for the two properties. In September 1973, the parties agreed to extend this modification for another 6 months, effective September 1, 1973. Petitioner and the bank also agreed that the bankruptcy claim proceeds attributable to the two properties on which the bank held deeds of trusts would be used to remodel those two properties. As an interim use of a portion of these proceeds, petitioner further agreed to purchase from the bank three certificates of deposit, each in the principal sum of $100,000. These certificates were purchased by petitioner, and their maturity dates corresponded to dates on which petitioner expected to need additional funds to remodel the two properties. The certificates were issued in petitioner's name, and interest on them was for petitioner's account, but the certificates were pledged to the bank to secure the loans. As of December 31, 1976, $181,059.01 was expended to remodel the Summer Avenue property. The South Third Street property had not been remodeled as of the time of trial due to the lack of a prospective tenant.

The terms of the promissory note entered into between petitioner and Northwestern Mutual Life Insurance Co. with regard to the Mendenhall Road property were not modified, and petitioner paid all amounts due thereunder. Although there was no evidence of a specific agreement, petitioner did use the bankruptcy claim proceeds attributable to the Mendenhall Road property to remodel that property. As of December 31, 1976, $204,833.40 was expended on that property. There is no evidence of what accounting was made of the difference between the amount attributable to ($229,987.51), and that expended for, that property.

Prior to the taxable year in issue, petitioner included in income all rental payments received from Miller-Wohl, and it took depreciation deductions for the store properties. On its 1973 consolidated Federal corporation income tax return, petitioner included in income the $60,037.46 received from Miller-Wohl in settlement of petitioner's administrative claim and took depreciation on the properties. Petitioner did not include in income the $689,962.54 received in settlement of petitioner's general claim. On the consolidated balance sheet attached to its return, however, petitioner did show $645,105.11 as "other liabilities." "Other liabilities" were explained as follows:

The other liabilities of $645,105.11 represent that part of restoration costs which correlate to the settlement in the bankruptcy of Miller Wohl, Inc. (Welles Stores) concerning the following properties:

(a)–3360 Highway 61 South (South Third St.—92,160 sq. ft.)
(b)–5230 Summer Ave. (Summer & White Station—92,160 sq. ft.)
(c)–3560 Mendenhall (Mendenhall-Winchester—92,160 sq. ft.)

The above properties were specifically designed for the functional requirements of the Welles Discount Stores of Miller Wohl, Inc. and then rented to Miller Wohl, Inc. under 30-year terms net leases. The parties to the leases: Belz Investment Co. Inc. (lessor), Union Commerce Bank, (mortgagee) and Miller Wohl, Inc. (lessee), concurred that the 30-year term of each of the three leases paralleled the economic useful life of the corresponding special purpose buildings. The buildings leased in the above under (a) and (b) were completed in October, 1970, while the building under (c) at 3560 Mendenhall was completed in June, 1972, which was only ½ year prior to Miller Wohl, Inc.'s (Welles Stores) bankruptcy. The part of restoration costs which correspond to the "other liabilities" in the amount of $645,105.11 represents expenditures still to be incurred as at December 31, 1973 due to a change in the business conditions which made it necessary to alter the business buildings, which were originally designed for a specific purpose, to the devotion of a radically different use. The bankruptcy settlement in the Miller-Wohl (Welles Stores) provided for a payment of $750,000.00 as per the following recapitulation.

| | |
|---|---:|
| Total bankruptcy received in full settlement ..... | $750,000.00 |
| Less: Applicable share of 1973 real estate tax payments ........................................... | (60,037.46) |
| Subtotal ................................................. | $689,962.54 |
| Less: Restoration cash expenditures made up to 12/31/73 ....................................... | (44,857.43) |

Balance of bankruptcy proceeds available
to pay in part the programmed restoration
expenditures ............................................ $645,105.11*

Held in escrow by mortgagee subject to
release when restoration work is completed ..... (300,000.00)

Present amount available (as at 12/31/73)
to Belz Investment Company, Inc., to pay
for programmed restoration work ................. $345,105.11

---

*The cost analysis of outside contractors showed that the restoration work (cost of alteration) will amount to $609,008.00. When the Welles Stores (Miller Wohl) went bankrupt and vacated the specially designed buildings, Belz Investment Company, Inc., as well as the mortgagee became fully aware of the fact that without costly alterations no usage for these special purpose structures could be found. Belz Investment Co.[,] Inc. and the mortgagee were also aware of the fact that the necessary costly alterations *would in no way increase* the original value of the buildings, nevertheless, they would avoid their forfeiture with the consequent loss of Belz Investment Co., Inc.'s equity (consisting of the respective building sites) and leaving the mortgagee with three unrentable buildings. The three respective mortgages ran only with the land and improvements. Belz Investment Co., Inc., under the terms of the respective trust deeds was not liable for any difference between the amount of the mortgages and the amount of proceeds which a forced forfiture [sic] sale (would) might bring.

The mortgagee (Union Commerce Bank) under the terms of the respective morgages was to receive all amounts paid by the tenants of the respective buildings except normal current rents. In view of the facts and circumstances involved, the mortgagee authorized the use of the aforementioned $345,105.11 of the bankruptcy proceeds in the restoration work as stated in the aforegoing.

In his notice of deficiency, respondent determined that the entire $750,000 amount was includable in income as gross rents and, thus, income was increased by the $689,962.54 amount which was not included.

## Section 6653(a) Additions to Tax

In addition to the determinations made with regard to the rental expense and bankruptcy claim issues, the respondent also determined for the taxable year 1973 that: (1) Compensation of $135,996.04 paid by petitioner to its chief executive officer was unreasonable to the extent of $60,000, and a section 162 deduction for said amount was denied; (2) adjustments to methods of depreciation and estimated useful lives of depreciable assets required a $86,809 decrease in petitioner's depreciation deduction from $558,640 to $471,831; and (3) petitioner was entitled to a lease amortization deduction of $80.05 and a charitable deduction of $6,381.07. The parties have agreed to compromise the reasonable compensation and depreciation issues by increasing petitioner's income in the amounts of $50,996.04 and $63,892.24.

## OPINION

### *"Rental" Payments*

The question to be decided is whether the amounts paid in excess of a specified amount for the use of a motel by Expressway to Holiday pursuant to the percentage rental formula contained in a lease agreement were in substance "rent" or "equity" when said amounts would be applied against the option purchase price should Expressway exercise its option to purchase the motel.

Petitioner asserts that the amounts are clearly rent, and as such deductible under section 162(a) because: (1) Expressway had to pay the amounts in order to continue its use of the property; (2) Expressway was not taking title and had no equity in the motel; (3) the rental amounts were reasonable; (4) the option purchase price was reasonable; and (5) Expressway and Holiday negotiated at arm's length, the parties had full liberty to contract, and there was no understanding that Expressway would exercise the option to purchase the motel. Petitioner argues that the legal test to be applied is one of economic substance which focuses on the parties' intent in entering into the transaction, and that the substance of the transaction comports with its form, namely, a bona fide sale-leaseback.

Respondent argues that the sale-leaseback transaction was in substance a "secured lending arrangement" whereby Holiday "loaned" $1,502,000 to Expressway when Holiday purchased the motel because Expressway's exercise of the option to purchase was a "foregone" conclusion at the time the sale-leaseback was consummated, and Expressway had all the indicia of ownership under the terms of the lease agreement. Respondent's assertion that Expressway's exercise of the option was a certainty is based on the contention that Expressway and Holiday could reasonably foresee the amount of "rent" which would be generated under the percentage rental formula and, therefore, could structure the lease agreement so that Expressway would have "paid" for the motel within the initial term of the agreement. Thus, respondent argues, petitioner cannot deduct amounts which build equity in a motel to which petitioner is taking title.[13]

Section 162(a) allows as a deduction all the ordinary and

---

[13]Respondent does not challenge the deductibility of the first $1,438,000 of "rental" payments.

necessary expenses paid or incurred during the taxable year, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which taxpayer has not taken or is not taking title or in which he has no equity." Therefore, notwithstanding that the amounts in question were paid for the use of the motel, they are deductible as rent only if they were made at a time when Expressway had not taken title to the property, was not taking title to the property, and had no equity in the property.

Characterization for tax purposes of the payments in issue is difficult because of the dual potential as either "rent" or "purchase price" which the payments possess. Whether such payments are "rent" or "purchase price" depends upon the substance of the transaction, not upon the form of the transaction or the labels used. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Helvering v. Lazarus*, 308 U.S. 252 (1939). The focus is the practical effect of the transaction, not its technical effect. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974); *Martin v. Commissioner*, 44 T.C. 731 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967).

Although it is agreed that the substance of the transaction is controlling, courts have focused on different factors to determine the substance of a particular transaction. One factor emphasized is the parties' intent, as gleaned from the facts and circumstances existing at the time of the transaction, including the economic realities. *Breece Veneer & Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956), revg. 22 T.C. 1386 (1954); *Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir. 1955), revg. a Memorandum Opinion of this Court; *Benton v. Commissioner*, 197 F.2d 745 (5th Cir. 1952), revg. a Memorandum Opinion of this Court; *Northwest Acceptance Corp. v. Commissioner, supra.* Other decisions have analyzed transactions in terms of whether the economic realities indicate that traditional business relationships of lessor-lessee were created. *Sun Oil Co. v. Commissioner*, 562 F.2d 258 (3d Cir. 1977), revg. a Memorandum Opinion of this Court. Another decision emphasized the nonsham nature of the transaction. *American Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974).

One of the most recent cases which addressed the question of

the tax substance of a sale-leaseback transaction was *Frank Lyon Co. v. United States, supra.* In reaching its conclusion that the transaction in issue was a bona fide sale-leaseback, the Supreme Court utilized a factual analysis. Thus, it is difficult to pinpoint a general legal proposition for which the case stands.[14] In summary, the Court did state, however:

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions. [435 U.S. at 583–584; fn. ref. omitted.]

The evidence establishes that while the motel was being constructed, Expressway became dissatisfied with the quality of the workmanship with which the motel was built and it began negotiations with Holiday concerning this problem. As a means of resolving this problem, Expressway and Holiday negotiated the terms of the transaction at arm's length. If Expressway was concerned with the quality of the workmanship with which the motel was built, structuring a bona fide sale-leaseback is certainly one method by which to assuage this concern, since it gave Holiday a greater incentive, as a result of its direct financial status, to repair any defects in workmanship. The warranty provision contained in the lease agreement reinforces the conclusion that the transaction was entered into for business reasons. Furthermore, there is nothing in the record to indicate that Expressway needed financing from Holiday; in fact, it had prior to this transaction contracted to have the motel built for itself. Nor was any evidence introduced which indicated that any other reason caused the transaction to be structured as it was.

[14]See, for example, *Davis v. Commissioner,* 585 F.2d 807, 814–815 (6th Cir. 1978), affg. 66 T.C. 260 (1976), in which the Sixth Circuit compared the facts present in *Davis* with those in *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978), in order to determine the relevance of the latter case. See also H. Weinstein and D. Silvers, "The Sale and Leaseback after Frank Lyon Company," 24 N.Y. Law School L. Rev. 337 (1978); S. Zarrow and D. Gordon, "Supreme Court's Sale-Leaseback Decision in *Lyon* Lists Multiple Criteria," 49 J. of Taxation 42 (1978); L. Kaster, "Another View of the Implications of the Supreme Court Decision in *Lyon,*" 49 J. of Taxation 44 (1978).

Respondent's argument that the transaction was structured in order to enable peitioner to obtain capital, generate business liquidity, and minimize taxes is without evidentiary basis. Accordingly, we conclude that it was the intent of the parties to establish a bona fide sale-leaseback.

The terms of the sale and leaseback and the status of the parties thereunder generally comport with the conclusion as to the intent of the parties. Expressway sold its interest in the motel property to Holiday for $1,502,000, of which amount approximately $35,000 represented profit. Respondent does not challenge the reasonableness of the sales price.[15] At this point, it is appropriate to note that petitioner has made our task more difficult by failing to introduce the sales contract or any other direct evidence of the obligations Holiday undertook as a result of its purchase of the motel property.[16] Our reading of the lease agreement, however, indicates that Holiday alone was obligated to pay both the ground rent and the first mortgage on the property.

Concurrently with the sale, Expressway agreed to lease the property from Holiday pursuant to an agreement which contained many of the same terms as the lease agreements entered into between petitioner and Holiday with regard to other motel properties. These same terms included: (1) Length of the initial term; (2) lessee's option to renew; (3) percentage rental formula; (4) absence of a minimal rental formula; and (5) lessee's responsibilities concerning taxes, maintenance of the premises, utilities, and insurance. There is no question that the lease agreements for the other transactions were bona fide. Thus, if the conclusion to be drawn is that the economic realities and the status of the parties under the agreement at issue are not in consonance with a bona fide lease, said conclusion must be based on the agreement terms which differ from those contained in the lease agreements for the other transactions. Primarily, two different terms exist, the option to purchase[17] and the disposition of insurance or condemnation award proceeds.

The option-to-purchase provision involves three primary as-

---

[15]In *Sun Oil Co. v. Commissioner*, 562 F.2d 258, 263 (3d Cir. 1977), revg. a Memorandum Opinion of this Court, the reasonableness of the sales price in a sale-leaseback transaction was given little consideration.

[16]See nn. 7 & 8 *supra*.

[17]Under the circumstances existing at the time the transaction took place, we think an option to purchase was entirely consonant with the overall relationship between the parties. Presumably,

pects: (1) The percentage rental formula; (2) the $1,438,000 amount; and (3) the option purchase price. There is no question that the percentage rental formula is a reasonable method by which to determine rental payments. Furthermore, the absence of a minimum rental provision required Holiday to look solely to the motel's performance for a return on its investment. What is at issue is the foreseeability of amounts generated under that formula in connection with the $1,438,000 amount and the option purchase price. Petitioner asserts that the uncertainty of the percentage rental formula, the fact that Expressway was inexperienced both in terms of Holiday Inns and the White Plains area, and the absence of any understanding or requirement that Expressway exercise the option lead to the conclusion that until Expressway actually exercises the option, it is unknown whether it will ever do so. We agree.

Although the evidence as to why the amount of $1,438,000 was agreed to by Expressway and Holiday is not as complete as we would hope, the amount is substantial. When the transaction was entered into by the parties, it was unknown what amounts would be generated under the percentage rental formula. Given the competitive nature of the motel industry and the many external forces which bear on the profitability of a particular motel, it cannot be said with any certainty what a motel's performance would be. Thus, we cannot agree with respondent that exercise of the option was a "foregone" conclusion. Until an operational record was established, Expressway could not know whether any "rental" payments would be applied against the option purchase price or whether Expressway would exercise the option to purchase.

The remaining aspect of the option-to-purchase provisions is the stated option purchase price. It is the same amount, $1,502,000, as Holiday originally paid for the motel property, and respondent does not challenge the reasonableness of that price. While we have no way of knowing whether this amount would represent the fair market value of the property when and if Expressway exercises its option to purchase,[18] we have no reason

---

Expressway had originally intended to own the motel being built under contract by Holiday. Had there not been problems with the construction, in all likelihood, Expressway would have continued ownership of the property; but it was reluctant to do so until the construction problems were solved.

[18]If Expressway were to renew the agreement for all three 10-year extensions, the option would be potentially exercisable through a 40-year period.

to believe that it would not be a fair price. While we recognize that this price would assure Holiday of a return of its investment if the option were exercised, the parties negotiated the price and other terms at arm's length.

While the agreement provisions concerning disposition of the insurance and condemnation award proceeds might confer some benefits on Expressway that a traditional lessee would not be expected to receive, we note that the lease agreement in *Frank Lyon Co. v. Commissioner, supra* at 570–571, contained insurance and condemnation award provisions similar to those involved herein.

The presence of these factors, however, does not sway us from our conclusion that the totality of facts and circumstances reveals that the substance of the transaction was a bona fide sale-leaseback which should be given effect for tax purposes. We find more indicative of the transaction's substance: (1) The presence of a business purpose for the sale-leaseback and the absence of any evidence that the transaction was tax motivated or a sham; (2) the percentage rental formula and the absence of any minimum rental; (3) the uncertainty as to whether the $1,438,000 amount would be exceeded;[19] and (4) Holiday's obligations to pay ground rent and the first mortgage. Thus, we are unable to conclude that the parties structured the transaction such that exercise of the option to purchase was a "foregone" conclusion. Expressway had nothing more than an option which, depending on events unforeseeable in the year the transaction occurred, it might or might not exercise.[20] Furthermore, we are satisfied that Holiday assumed the risks of an owner-lessor since there was no assurance, either by agreement or as a result of foreseeable economic events that Expressway would exercise the option to purchase. If the property did poorly or structural problems developed, there was nothing to prevent Expressway from terminating the agreement after the initial term.

Accordingly, petitioner is entitled to deduct as a section

---

[19]There was some evidence that subsequent to this transaction, due to the economy and inflation, motel room rates doubled and occupancy was higher than before.

[20]Under the terms of the agreement, Expressway could not exercise the option before 1978 and, of course, could not have done so in 1973, the year before us. It is possible that with continuing inflation, the cumulative percentage rentals prior to 1978 would exceed the total option price; hence, Holiday might not agree to an earlier exercise of the option.

162(a)(3) rental expense the $276,835.72 paid by Expressway to Holiday in 1973 pursuant to the percentage rental formula.

### Bankruptcy Claim

The second issue to be decided is whether petitioner is required to include in income the entire $750,000 amount paid by Miller-Wohl on petitioner's claim in the bankruptcy proceeding or whether it correctly included only the $60,037.46 amount attributable to settlement of its administrative claim.

Petitioner's argument in support of its assertion that only the $60,037.46 is properly includable in income is two-fold: (1) Settlement of petitioner's general claim was not based on any claim for rent but rather was based on what it would cost to "reconstitute" the properties in order to make them economically viable; and (2) the mortgagees of the properties, Union Commerce Bank and Northwestern Mutual Life Insurance Co., had absolute right to the proceeds from the settlement under the terms of the deeds of trust.

Respondent assessed the deficiency and grounded his argument on the basis that the proceeds from the settlement of the general claim were in the nature of rent and thus were includable in income under section 61.

Characterization for income tax purposes of the amount received by petitioner in settlement of its general claim in bankruptcy against Miller-Wohl depends upon the nature of the claim settled. *Hort v. Commissioner*, 313 U.S. 28 (1941); *Turzillo v. Commissioner*, 346 F.2d 884 (6th Cir. 1965), revg. a Memorandum Opinion of this Court. An amount received by a lessor for cancellation of a lease is a substitute for rent and is taxable as such. Sec. 1.61–8(b), Income Tax Regs.; *Hort v. Commissioner*, *supra*. Petitioner has the burden of proving wrong respondent's determination that the settlement proceeds were in the nature of rent. Rule 142, Tax Court Rules of Practice and Procedure.

Petitioner and Miller-Wohl entered into three lease agreements, the terms of which required Miller-Wohl to pay rent, insurance costs, real estate taxes, and some maintenance expenses. The lease agreements did not include a provision that obligated Miller-Wohl to pay the costs of remodeling the properties in the event Miller-Wohl defaulted. Subsequent to the Miller-Wohl's filing for an arrangement under chapter XI of the Bankruptcy Act and its vacation of the store properties,

petitioner filed a claim in the bankruptcy proceedings based on "rental for certain real property." Petitioner's claim was settled, and petitioner and Miller-Wohl each released the other from the lease agreements.

At trial, petitioner introduced testimonial evidence to the effect that, notwithstanding the language of its claim in the bankruptcy proceeding, the claim was settled on the basis of what it would cost petitioner to "reconstitute" the stores rather than any claim for rent under the lease.

Under the statute applicable to chapter XI proceedings for the year in issue, a lessor could recover "for injury resulting from the rejection of an unexpired lease of real estate," subject, however, to certain limitations not here applicable. Act of June 22, 1938, Ch. 575, Pub. L. 696, 52 Stat. 910, 11 U.S.C. sec. 753. In order to recover under this section, a lessor must prove his actual damages. *City Bank Co. v. Irving Trust Co.*, 299 U.S. 433 (1937); 9 Collier on Bankruptcy (14th ed.), par. 7.15 [6.1], p. 82. In *City Bank Co. v. Irving Trust Co., supra* at 443, the Supreme Court, in discussing what a lessor would recover for the unexpired term of the lease under the predecessor of the above section, stated:

> The amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth. * * *

Clearly, any claim in bankruptcy which is designed to equalize two rental amounts is includable in income as rent. It is difficult to conclude that petitioner had a claim against Miller-Wohl other than one for rent when: (1) Miller-Wohl's primary obligation under the lease agreement was to pay rent; (2) no provision existed which obligated Miller-Wohl to "reconstitute" the properties in the event of a default; (3) the lease provisions applicable in the event of Miller-Wohl's default obligate Miller-Wohl to indemnify petitioner for any difference between the rent to which petitioner was entitled under the leases and that which petitioner actually received upon reletting the properties; (4) petitioner's claim in the bankruptcy proceedings was phrased as "rental for certain real property;" and (5) the measure of loss under the bankruptcy statute as enunciated in *City Bank Co.* is based on rent.

It may be that the amount petitioner agreed to accept in settlement of its claim was calculated by petitioner to be the cost of remodeling the stores; that does not change the basic

character of the claim or the amount received in settlement thereof.

Even if it is legally permissible under the bankruptcy statute for "actual damages" to include the cost of "reconstituting" the leased properties, petitioner has not introduced sufficient evidence to establish that his claim was settled on such a basis. Furthermore, even assuming that petitioner's claim included amounts for reconstituting the properties, the underlying nature of petitioner's claim remained the same. Petitioner's claim was derived from the unexpired term of the lease agreements and was based on rent. Had Miller-Wohl not experienced financial difficulty, and had it continued in the store properties and fulfilled its obligations under the lease agreements, petitioner would have received only rent over the course of the lease agreements. At the conclusion of the lease agreements, petitioner would have had three store properties, albeit in worse condition due to normal wear and tear, which would require considerable "reconstituting" in order to make them tenantable for others. While it is unfortunate that Miller-Wohl's financial difficulties prevented petitioner from recovering the construction cost of the properties by way of the rent payments, such fact does not alter the nature of petitioner's claim. Thus, petitioner has, in effect, received rent in a lump-sum amount.

Having concluded that the $689,962.54 amount received by petitioner was in the nature of rent and includable by it in income, we must address petitioner's argument that the mortgagees had a right to the general claim proceeds.

Petitioner had the right to receive and to include in income the rent received from Miller-Wohl. The deed of trust provisions which limited petitioner's ability to accrue future rents were to prevent petitioner from impairing the security which the lease agreements provided for the nonrecourse loans; they in no way affected who had the right to the rental amounts under the lease. Similarly, petitioner's assignment of the leases as security does not affect its right to the rental amounts. *Bolger v. Commissioner*, 59 T.C. 760, 768 (1973). Petitioner's use of the general claim proceeds to remodel the properties does not change their nature. Nor does the bank's modification of the petitioner's promissory note or petitioner's use of a portion of the proceeds to purchase certificates of deposit.

Petitioner would liken the bankruptcy recovery to a recovery

from insurance or condemnation of the property, which the mortgagees had control rights to under the terms of the deeds of trust. But in those instances, the properties securing the notes would have been damaged or destroyed, and the payments would be in replacement thereof, while here the properties were not destroyed. If the mortgagees retained insurance of condemnation proceeds they would be applied to reduce petitioner's indebtedness—in other words, they would simply be applying petitioner's funds to reduce the indebtedness. But the insurance or condemnation proceeds attributable to petitioner and applied by the mortgagees would not have the character of rent in petitioner's hands, as do the funds we are concerned with here.

Accordingly, we conclude that the petitioner had a right to the proceeds from settlement of its general claim, that such proceeds were in the nature of rent, and that they are properly includable in petitioner's income. The proper tax treatment of any amount petitioner expended in remodeling the store properties is a question not before the Court.

### *Section 6653(a) Additions to Tax*

Respondent imposed an addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations for both the 1970 and 1973 taxable years. For the taxable year 1973, the assessment of the addition to tax does not appear justified. On the consolidated balance sheet attached to its consolidated corporate income tax return, petitioner provided sufficient information concerning "other liabilities" to apprise the respondent of the nature of the bankruptcy claim proceeds and its belief as to the proper accounting for those proceeds. *Wesley Heat Treating Co. v. Commissioner*, 30 T.C. 10, 25–26 (1958), affd. 267 F.2d 853 (7th Cir. 1959); *Pullman, Inc. v. Commissioner*, 8 T.C. 292, 299 (1947). That it applied the law to the facts pertaining to the bankruptcy claim differently than respondent and we did does not justify a negligence penalty. We have found it difficult to arrive at the proper legal conclusion on both of the substantive issues discussed herein—and we differed from respondent on the first issue and from petitioner on the second issue. Thus, petitioner did not act negligently or with intentional disregard for rules or regulations in not including the general claim proceeds in income. Furthermore, any underpayment of tax which results from the adjustment to petitioner's

deductions for compensation and depreciation is similarly not due to negligence or intentional disregard of rules and regulations.

The additions to tax for the year 1970 also cannot be sustained. If petitioner was not negligent or acting with intentional disregard of rules and regulations when it originally prepared its 1973 tax return and determined that a net operating loss existed to be carried back to 1970, then a penalty cannot be sustained when petitioner took the next step and carried back the net operating loss.

*Decision will be entered under Rule 155.*