SUFFOLK COUNTY PATROLMEN'S BENEVOLENT ASSOCIATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6171–79, 10250–80.    Filed December 23, 1981.

*Robert I. Kurtz*, for the petitioner.
*Adeline Malone*, for the respondent.

FORRESTER, *Judge*: In these consolidated cases, respondent has determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Docket No. | Deficiency |
|------|------------|------------|
| 1974 | 6171–79 | $54,069 |
| 1975 | 6171–79 | 28,285 |
| 1976 | 10250–80 | 48,605 |

The sole issue for decision is whether petitioner's fundraising activities during the taxable years 1974, 1975, and 1976, which consisted of the presentation and sponsoring of professional entertainment shows and the sale of advertising in a program guide, constituted an unrelated trade or business which was regularly carried on, the income from which is taxable as

unrelated business taxable income pursuant to sections 511 through 513.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is an organization exempt from Federal income tax pursuant to the provisions of section 501(c)(5).[2] At the time its petitions herein were filed, petitioner maintained its offices in Deer Park, N.Y. Its returns for the years involved (Forms 990) were filed with the Internal Revenue Service at Holtsville, N.Y.

Petitioner (hereinafter sometimes referred to as the PBA) is a nonprofit corporation organized under the laws of the State of New York. Its membership consists of policemen and law enforcement officers of the Suffolk County police district. The purposes of the PBA include promoting a fraternal spirit among its members, advancing the welfare and efficiency of the Suffolk County Police Department (hereinafter SCPD), and acting as the sole collective bargaining agent for all police officers in that police department. Additionally, the PBA was actively involved in various community service projects.

Prior to August 1971, officers of petitioner were approached by Roy Radin (hereinafter Radin), a theatrical producer, about the possibility of the PBA's sponsoring a professional vaudeville show as a fundraising event. A substantial investigation by petitioner revealed that many police organizations throughout the country were doing business with Radin[3] and that they were satisfied with him. Thus, on July 25, 1971, petitioner entered into a contract with Roy Radin Theatrical Productions (hereinafter sometimes referred to as Productions) whereby Productions agreed to present entertainment shows under the sponsorship of petitioner for two nights in May 1973 and again in May 1974. The parties entered into a similar contract on October 2, 1973, for the production of like entertainment shows for two nights each in May of 1975 and 1976.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

[2]During the years in issue, petitioner was an exempt organization under sec. 501(c)(4).

[3]Radin has produced vaudeville shows for as many as 30 police organizations in any given year throughout the United States.

These contracts provided that Productions would supply, without cost to the PBA, the complete cast and all employees of the variety show, the sound system, building, and promotional advertising on radio and in the press. Additionally, Productions agreed to sell advance advertising (to be placed in the program guide) and tickets. The PBA agreed to "lend their support" in the placing of tickets to be sold and in the collection of moneys therefrom. Petitioner also agreed to provide ticket takers, ushers, and "their moral support in making [the] engagement a success." In exchange for these covenants, petitioner was to receive 28 percent of gross advertising revenues and 50 percent of the ticket revenues.[4]

During each of the years in issue, vaudeville shows were presented in accordance with the above contracts.[5] All performances took place in a local high school auditorium seating approximately 2,000 persons. There were four performances in each of 1974 and 1975, and three in 1976. All performances took place on consecutive Saturdays and Sundays. In 1974 and 1975, there were afternoon and evening shows each day, while, in 1976, there were two evening shows and only one afternoon show.

The vaudeville shows sponsored by petitioner were designed as family entertainment. Professional jugglers, musicians, animal acts, magicians, comedians, and singers performed. Additionally, amateur groups, such as baton twirlers and a drum and bugle corps appeared. In 1974, some of the professional performers included Frank Gorshin, Frank Fontaine, Paul Winchell, George Gobel, and George Jessel.

The price of tickets to each show was $2.50; however, each year the PBA gave away approximately 2,000 tickets to the Boy and Girl Scouts, senior citizens, retarded children, and

---

[4]On Dec. 11, 1975, petitioner entered into a 1-year contract with Advance Promotions, Inc. (hereinafter Promotions), whereby the latter agreed to perform all services relating to the sale of advertising in the 1976 program guide. Petitioner agreed to pay Promotions 30 percent of the gross advertising revenues. Additionally, PBA agreed to provide an office with 50 telephones for 6 weeks for Promotion's use and one of its members to work with Promotion's staff. The record herein is unclear how or why Productions was released from its obligation under the October 2, 1973, contract with respect to the duties assumed by Promotions. Since Productions did produce the 1976 show for petitioner, it is also unknown what new payment arrangements PBA had with it.

[5]Similar shows were sponsored by petitioner and produced by Radin in 1972 and 1973, and 1977.

others. PBA members attended the performances as ticket takers, ushers, and the like. Tickets were sold at the door and in advance. Productions (and Promotions in 1976) had the responsibility of informing the general public of the shows and times. This was accomplished by announcements on radio and in the newspapers, which originated in Suffolk County.

Each person who attended a performance of the vaudeville show was offered a program guide (hereinafter sometimes referred to as the guide). The guides contained approximately 20-percent editorial matter. This included information about the show and its performers, photographs of PBA members, photographs of past community activities sponsored by the PBA, and general information concerning the SCPD and law enforcement in general. The balance of the guides contained advertising from local businesses, hospitals, churches, professionals, and sundry other organizations. In most instances, these included only the name, address, and telephone number of the person or organization. In some cases, slogans were used. Additionally, some pages, or parts thereof, merely stated "compliments of a friend." At the end of each guide was a mere listing of names of other contributors (mostly professional individuals), and an alphabetical "Index to Advertisers." In no case was the price of goods advertised, and only rarely did the advertisements mention specific services or products (never brand names).

Because the SCPD patrolled five towns in Suffolk County,[6] the guide was published in five editions—one for each town. At the performances, five stacks of guides were placed at the entrance to the auditorium. The patrons of the show could select which edition(s) of the guide they desired. Additionally, a copy of the guide was sent to advertisers therein upon request and was made available to anyone who requested it, but there was no distribution to the general public or to anyone who did not specifically request one. Of the 6,000 to 7,000 copies of the guide that were printed each year, all but a few hundred were distributed at the performances. Leftover guides were kept awhile at PBA offices and then destroyed.

Solicitation of advertising for the guides began approximate-

---

[6]Huntington, Smithtown, Brookhaven, Islip, and Babylon are the towns covered by the SCPD.

ly 8 to 16 weeks prior to the time of the show. All such solicitation was performed under the direction of, and by employees of, Productions in 1974 and 1975, and Advance Promotions, Inc. (Promotions), in 1976. Ten to 25 persons were hired to go through local telephone directories and to call local businesses, professionals, and other organizations selling advertisements and listings, or merely seeking contributions. For the 1974 and 1975 guides, members of the PBA picked up the listing copy from supporters and collected the money therefor. In 1976, the collection duties were assumed by Promotions.

Approximately 6 months prior to petitioner's first show in 1972, PBA opened a bank account to be used for moneys raised in connection therewith. As advertising revenues were collected, the money was delivered to petitioner's treasurer who counted it and then deposited it in that account. At the time of the shows, the PBA treasurer would give Radin (and Promotions in 1976) his percentage of the revenues collected. The bank account opened by the petitioner in 1972 was never closed.

During the years in issue, the vaudeville shows constituted the only outside fundraising activity of petitioner. The only other source of funds for the PBA was dues from the membership. In 1974, 1975, and 1976, the gross receipts derived from the vaudeville shows (including the sale of advertising for the guide), and the petitioner's portion thereof are as follows:

| Year | Gross revenue | PBA share |
|------|---------------|-----------|
| 1974 | $441,406.09 | $127,186.25 |
| 1975 | 325,625.50 | 88,052.52 |
| 1976 | 399,246.96 | 139,709.26 |

The great majority of the gross receipts was derived from the sale of advertising for the guide.[7] The income which petitioner derived from the vaudeville shows was not reported on its returns for the years in issue as unrelated business taxable income under section 511(a).

Respondent has determined that petitioner's fundraising

---

[7] Even if each performance was sold out, and no tickets were given away, the maximum ticket revenues in any year would not exceed about $20,000. Revenues from ticket sales alone would have been insufficient to cover the costs of producing the shows.

activities during 1974, 1975, and 1976, vis-a-vis the vaudeville shows and the sale of advertising in the guide, constitute an unrelated trade or business, the income from which is taxable under sections 511 through 513.

OPINION

Sections 511 through 513 provide for the imposition of a tax on the income of an otherwise tax-exempt organization derived from regularly conducted trades or businesses which are not substantially related to the organization's exempt prupuses. Thus, for an organization to be subject to the tax on unrelated business taxable income, the income-generating activity must meet each of three requirements: (1) It must constitute a "trade or business"; (2) which is "not substantially related" to the organization's exempt purposes; and (3) which is "regularly carried on." Sec. 1.513-1(a), Income Tax Regs., *Smith-Dodd Businessman's Assn., Inc. v. Commissioner*, 65 T.C. 620, 623 (1975).

Respondent asserts that with regard to petitioner's annual fundraising event—the variety shows—all of the criteria necessary to subject the income therefrom to tax have been satisfied. Petitioner does not dispute that its fundraising activity was not substantially related to its exempt purposes. Although petitioner does dispute that the annual vaudeville show constituted a trade or business, its primary argument herein is that even if the show was a trade or business it was not "regularly carried on."

The requirement that an unrelated trade or business be "regularly carried on" is found in section 512(a)(1).[8] That term, however, is not defined in the statute itself.

The regulations provide that in determining whether a trade or business is regularly carried on, regard must be given to the "frequency and continuity" with which the activities are conducted and the "manner in which they are pursued." Sec.

---

[8]SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) DEFINITION.—For purposes of this title—

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

1.513–1(c)(1), Income Tax Regs. Additionally, this requirement must be applied in light of the purpose of the tax on unrelated business taxable income, i.e., to avoid unfair competition by placing exempt organizations upon the same tax basis as similar nonexempt business endeavors with which they compete. *Hope School v. United States*, 612 F.2d 298, 303 (7th Cir. 1980); sec. 1.513–1(c)(1), Income Tax Regs.[9] Hence, the business of an exempt organization will usually be deemed "regularly carried on" if it manifests a frequency and continuity, and is pursued in a manner, generally similar to comparable activities of nonexempt organizations. Sec. 1.513–1(c)(1), Income Tax Regs. This analysis requires that we give consideration to all the facts and circumstances surrounding the subject activity.

Although there appear to be no decided cases specifically concerning the meaning of "regularly carried on" in the context of sections 511 through 513, the regulations and the legislative history add a significant amount of detail. For instance, section 1.513–1(c), Income Tax Regs., indicates that where the subject activity is of a sort that a nonexempt commercial organization would conduct on a year-round basis, such conduct for only a few weeks by an exempt organization does not constitute "regularly carrying on" (i.e., a sandwich stand operated for 2 weeks by a hospital auxiliary at a State fair is not regularly carried on, but a parking lot operated on Saturday of each week is regularly carried on). The operation of a seasonal business, however, for several weeks would more likely be considered regular.

Activities engaged in only discontinuously or periodically will generally not be considered regularly carried on if conducted without the competitive and promotional efforts typical of commercial endeavors. An example of such an

---

[9]Sec. 1.513–1(c)(1), Income Tax Regs., provides:

(c) *Regularly carried on* —(1) *General principles.* In determining whether trade or business from which a particular amount of gross income derives is "regularly carried on," within the meaning of section 512, regard must be had to the frequency and continuity with which the activities productive of the income are conducted and the manner in which they are pursued. This requirement must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete. Hence, for example, specific business activities of an exempt organization will ordinarily be deemed to be "regularly carried on" if they manifest a frequency and continuity, and are pursued in a manner, generally similar to comparable commercial activities of nonexempt organizations.

activity that would not ordinarily be deemed regularly carried on is the publication of advertising in programs for sports events or music or drama performances. Sec. 1.513–1(c)(2)(ii), Income Tax Regs. Further, some activities occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be considered regularly carried on. These are "intermittent activities" lasting only a short period of time, and occurring only occasionally or sporadically. But, the fact that such an activity is annually recurrent will not cause it to be regarded as regularly carried on (*such as an annual dance*). Sec. 1.513–1(c)(2)(iii), Income Tax Regs.

Additionally, at the time the Congress enacted the tax on unrelated business taxable income, it spoke to the meaning and purpose behind the regularly carried on requirement. The Senate committee report stated (S. Rept. 2375, 81st Cong., 2d Sess. 106–107 (1950)):

*Definition of unrelated trade or business*

As used in this section, the term "trade or business" has the same meaning as it has elsewhere in the code, as, for example, in section 23(a)(1). [Now sec. 162(a).] The definition of unrelated business net income in section 422, [now secs. 511–513] however, includes only income from unrelated trades or businesses which are regularly carried on. Thus, in determining whether the income of an exempt organization from a trade or business is subject to the Supplement U tax, *it is first necessary to determine whether it is income from a trade or business which is regularly carried on, or is income from a sporadic activity.* If a charitable organization, exempt under section 101(6) [now sec. 501(c)] of the code, gives an occasional dance to which the public is admitted for a charge, hiring an orchestra and entertainers for the purpose, this would not be a trade or business regularly carried on within the meaning of section 422. Likewise, an organization which operates a sandwich stand during the week of an annual county fair is not regularly carrying on a trade or business. On the other hand, if an organization operates a public parking lot one day each week, the organization would be regularly carrying on a trade or business. Similarly, if an organization owned a race track, this would not be considered an occasional activity even though the track was operated only a few weeks every year, since it is usual to carry on such a trade or business only during a particular season. [Emphasis supplied.]

On the basis of the statute, its legislative history, and the regulations promulgated thereunder, we are convinced that the fundraising activities of petitioner during the years in issue were not conducted with sufficient frequency and continuity or, in such manner, to be regarded as having been "regularly carried on."

Petitioner sponsored the annual vaudeville shows 1 weekend per year for at least 6 consecutive years. All arrangements for the production and advertising of the show itself were performed under contract by an independent producer (Radin). The solicitation and publication of advertising in the various editions of the program guides were conducted under contract by a promoter (Productions or Promotions). The advertisements themselves more closely resembled complimentary contributions than commercial selling agents. Preparation for the shows, including the solicitation of advertisers, lasted no longer than 8 to 16 weeks per year. The program guides were distributed only in conjunction with the shows, i.e., to those attending the shows, at the door, and not to the general public. Petitioner had no risk of loss as it received a percentage of the gross receipts from the sale of advertising and tickets.

We find this annual fundraising activity substantially the same as those identified in the regulations and the legislative history of sections 511 through 513 as being "intermittent," and not "regularly carried on." In fact, it is almost identical to the example found in section 1.513–1(c)(2)(ii), Income Tax Regs., which states that the publication of advertising in programs for sports events or music or drama performances is not "regularly carried on."[10] It is merely an "intermittent activity" to which Congress did not intend the tax on unrelated business taxable income to apply. The regulations do not define "intermittent," but it is clear from both the language and the examples therein that activities conducted once a year, albeit annually recurrent, fit within the meaning of that term. Sec. 1.513–1(c)(2), Income Tax Regs.

We are unpersuaded by the factors to which respondent points in his attempt to convince us that petitioner's activities were regularly carried on. First, respondent notes that petitioner's activities were "commercially and systematically carried on by a professional organization" under contract covering a total of at least 6 years. Assuming that the vaudeville shows constituted a trade or business, they are commercial in nature, but that does not mean they were regularly carried on. Such infrequent, intermittent activity is

---

[10]Respondent maintains, and we agree, that the actual performance of the vaudeville show and the solicitation of advertising for the program guide are a single inseparable activity.

not regularly carried on regardless of the manner in which it is conducted. Sec. 1.513–1(c)(2)(iii), Income Tax Regs. The fact that they were systematically conducted means only that they were well organized, as one would expect any fundraiser to be. As petitioner's activities constituted its "annual" fundraising event, we are not surprised that the subject shows were sponsored 6 consecutive years. Nor is it problematic that petitioner anticipated that the shows would continue annually into the indefinite future. The regulations specifically provide that the annually recurrent nature of an intermittent activity will not cause it to be regarded as regularly carried on. Sec. 1.513–1(c)(2)(iii), Income Tax Regs.

Additionally, respondent would have us find that petitioner's activity was regularly carried on because an independent professional organization was under contract to produce and promote the shows (including the program guide). Respondent apparently believes that all fundraisers of exempt organizations are conducted by amateurs in an amateurish manner. We do not believe that this is, nor should be, the case. It is entirely reasonable for an exempt organization to hire professionals in an effort to insure the success of a fundraiser, and there are no indications in the regulations or legislative history of sections 511 through 513 that the use of such professionals would cause an otherwise infrequent intermittent activity to be considered regularly carried on.

Second, respondent makes much of the fact that petitioner, as well as the producer and the promoter, spent a great deal of time negotiating and organizing the fundraising activities. The time spent annually preparing for the vaudeville shows and the program guide was 8 to 16 weeks.[11] Apparently, respondent includes in the duration of an activity the time necessary to organize and prepare for it. But, nowhere in the regulations or the legislative history of the tax on unrelated business income is there any mention of time apart from the duration of the event itself. Planning for large annual church bazaars

---

[11]The record is contradictory regarding time required annually to produce and promote the shows, including advertising solicitation. Petitioner's treasurer for 1974 and 1975 indicated perhaps 6 months, while petitioner's treasurer for 1976 and 1977 stated the process took only 14 to 16 weeks. Mr. Radin, the producer, said that the duration was 8 to 12 weeks per year. In our findings, *supra*, we found that 8 to 16 weeks was the approximate time from the beginning of solicitation to the actual performance.

or fairs often begins shortly after one is completed—almost a year in advance. The fact that an organization seeks to insure the success of its fundraising venture by beginning to plan and prepare for it earlier should not adversely affect the tax treatment of the income derived from the venture.

Third, respondent seeks to place much importance on the size of the promoter's professional solicitation staff for the program guides—15 to 25 persons. As with the amount of preparation time spent, we do not consider the number of persons involved in the preparation of that activity, professional or amateur, a controlling factor in determining whether the activity itself is regularly carried on or intermittent.

Finally, respondent calls our attention to four revenue rulings which he suggests we should follow. A revenue ruling is merely respondent's interpretation of a section or regulation and is not binding upon us. *Edwards v. Commissioner*, 32 T.C. 751, 756 (1959). Two of the rulings cited by respondent, Rev. Rul. 74–38, 1974–1 C.B. 144 and Rev. Rul. 76–93, 1976–1 C.B. 170, are inapposite, as they respectively involve monthly and bimonthly publications—a level of activity far in excess of that presented herein.[12]

The other rulings present facts much more closely related to those of the instant litigation. In Rev. Rul. 73–424, 1973–2 C.B. 190, respondent held that the distribution of an annual yearbook, containing editorial matter and advertising, to the organization's entire membership was unrelated business taxable income. Under the facts presented therein, the advertising solicitation was conducted annually by an independent commercial firm under contract to the exempt organization over 3 months. Respondent determined therein that this fact rendered the manner of the activity so similar to that of commercial activities as to be regarded as regularly carried on.

In Rev. Rul. 75–201, 1975–1 C.B. 164, respondent held that the distribution of an annual concert book, which contained paid advertising, to patrons of an annual ball at the event itself, to raise funds for an exempt symphony orchestra was not unrelated business taxable income. Respondent distinguished Rev. Rul. 73–424, *supra*, on the basis that that fact

---

[12]See also Rev. Rul. 75–200, 1975–1 C.B. 163.

situation involved a commercially controlled and directed advertising solicitation program, solicitation lasted 3 months, and the publication was not distributed in connection with any other fundraising event or tied in with any other organization activity of that kind.

We agree with respondent's holding in Rev. Rul. 75–201, *supra*, and we consider the facts of the instant case to be substantially similar in all material respects. Because the use of the words "annual concert book" in that ruling, we presume that that activity was annually recurrent. Thus, the only real difference between the facts of the instant case and those of Rev. Rul. 75–201, *supra*, is that the former includes professional solicitation, while that of the latter was voluntary. As noted *supra*, we do not consider that distinction determinative.

On the other hand, Rev. Rul. 73–424, *supra*, is substantially dissimilar from Rev. Rul. 75–201, *supra*, and the instant case. In light of the regulations and the legislative history of sections 511 through 513, wherein every example of an activity not considered regularly carried on concerns an event of some sort (sandwich stand, sports, drama or music event, dance, etc.), the fact that Rev. Rul. 73–424 presents no event to accompany its publication is no small variance. While we express no opinion as to the correctness of respondent's holding in that ruling, suffice to say that it is distinguishable from the case at bar.

Consequently, based on the foregoing, we hold that the annual vaudeville shows, and accompanying program guides, presented by petitioner during 1974, 1975, and 1976, did not constitute an unrelated trade or business which was regularly carried on. Thus, the income derived therefrom is not unrelated business taxable income as defined in section 512, and it is unnecessary for us to consider whether the petitioner's fundraising activities during 1974, 1975, and 1976 constituted an unrelated trade or business.

Accordingly,

*Decisions will be entered for the petitioner.*