NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 89–9005.

United States Court of Appeals, Tenth Circuit.

Sept. 20, 1990.

C.W. Crumpecker, Jr. (George H. Gangwere and W. Ann Hansbrough with him on the briefs), of Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, Mo., for petitioner-appellant.

Bruce R. Ellisen, Atty. (Shirley D. Peterson, Asst. Atty. Gen., and Gary R. Allen and Robert S. Pomerance, Attys., with him on the brief), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before SEYMOUR and TACHA, Circuit Judges, and BRATTON,* District Judge.

SEYMOUR, Circuit Judge.

The National Collegiate Athletic Association (NCAA), the petitioner in this case, appeals from the decision of the tax court, which determined a deficiency of $10,395.14 in unrelated business income tax due for the 1981–1982 fiscal year.[1] On appeal, the NCAA challenges the court's conclusion that revenue received from program advertising constituted unrelated business taxable income under I.R.C. § 512, not excludable from tax as a royalty under section 512(b)(2), I.R.C. § 512(b)(2). We reverse.[2]

I.

The NCAA is an unincorporated association of more than 880 colleges, universities, athletic conferences and associations, and other educational organizations and groups

---

* Honorable Howard C. Bratton, Senior United States District Judge, District of New Mexico, sitting by designation.

1. Unless otherwise noted, citations to the Internal Revenue Code or to Treasury Regulations refer to the law in force as of 1982, when the tax year in question ended.

2. Our determination that the advertising revenue is not unrelated business taxable income obviates the need to consider whether the income should nonetheless be excluded from taxation as a royalty under I.R.C. § 512(b)(2).

related to intercollegiate athletics, for which it has been the major governing organization since 1906. The NCAA is also an "exempt organization" under section 501(c)(3) of the Code, I.R.C. § 501(c)(3), and hence is exempt from federal income taxes. One of the purposes of the NCAA, as described in the organization's constitution, is "[t]o supervise the conduct of ... regional and national athletic events under the auspices of this Association." Rec., exh. 3–C, at 7. Pursuant to this purpose, the NCAA sponsors some seventy-six collegiate championship events in twenty-one different sports for women and men on an annual basis. The most prominent of these tournaments, and the NCAA's biggest revenue generator, is the Men's Division I Basketball Championship. The tournament is held at different sites each year. In 1982, regional rounds took place at a variety of sites, and the Louisiana Superdome in New Orleans was the host for the "Final Four," the tournament's semifinal and final rounds. In that year, the Championship consisted of forty-eight teams playing forty-seven games on eight days over a period of almost three weeks. The teams played in a single-game elimination format, with each of the four regional winners moving into the Final Four.

The NCAA contracted with Lexington Productions, a division of Jim Host and Associates, Inc. ("Host" or "Publisher"), in 1981 to print and publish the program for the 1982 Final Four games.[3] The purpose of such programs, according to the NCAA's then-director of public relations, is

> "to enhance the experience primarily for the fans attending the game.... [It also] gives the NCAA an opportunity to develop information about some of its other purposes that revolve around promoting sports [as a] part of higher education and demonstrating that athletes .can be good students as well as good participants."

Rec., vol. II, at 21–22.

Prior to the middle of the 1970s, the host institution produced the Final Four program. The NCAA took over production until the late 1970s, when it began contracting with Host for the Final Four program. In 1982, Host began producing the

**3.** The agreement read in part:

"WHEREAS, NCAA desires to arrange for the publication and sale of, and for the sale of advertising space in, its 1982 National Collegiate Basketball Championship souvenir program; and

WHEREAS, Publisher has agreed to provide said services on the terms hereinafter set forth;

NOW THEREFORE, it is AGREED as follows:

1. *Appointment and Authorization.* NCAA hereby grants to the Publisher the exclusive right to print and to publish as co-publisher with the NCAA the 1982 National Collegiate Basketball Championship Program for the semifinals and finals to be held in New Orleans, LA, on March 27 and 29, 1982, and NCAA hereby appoints Publisher as its exclusive agent for the sale of advertising to be included in said program publication....

2. *Services.* The Publisher agrees to produce the program in accordance with copy submitted to Publisher by the NCAA and to deliver the agreed upon number of copies.... Publisher agrees further to use its best efforts to secure national and local advertising for said program. Publisher agrees to accomplish the foregoing ... under the following terms:

(a) Publisher shall plan, organize and conduct an advertising sales program for the aforementioned publication.

(b) Publisher shall create and develop advertising ideas.

(c) Publisher shall bill all advertising clients ... and furnish the NCAA with a complete record of sales billed, amount collected, and amount of ... commissions.

(d) Publisher shall agree to pay all layout, printing, production and freight costs, and all costs and expenses incurred in the selling of the advertising.

3. *Advertising Limitations.* a) Advertising in the program shall not exceed 35% of the total pages in the program, including the cover pages.... f) The NCAA reserves the right of final approval for all advertising in the aforementioned program.

\* \* \* \* \* \*

6. *Compensation and Expense.* Publisher agrees to pay to NCAA for co-publishing and advertising rights the sum of $50,000 or 51% of net revenues, whichever is greater. Net revenues shall mean gross revenues for all NCAA program sales and advertising sales less printing costs, vendor commissions, advertising commissions, sales taxes, and advertising production expense.... NCAA shall have the right to examine Publisher's financial records pertaining to the NCAA accounts at any time." Rec., vol. I, doc. 2, exh. B, at 1–3. Host and the NCAA also entered into an oral agreement under which Host produced a uniform program for the regional tournament games.

programs for all rounds of the Championship. The motive for contracting the program production to Host was, according to the NCAA, to achieve consistency and quality at each round's game sites; making a profit was not the primary incentive. *See id.* at 25–26.

The "Official Souvenir Program" for the 1982 Final Four round of the tournament was some 129 pages long, and it featured pictures of NCAA athletes such as Michael Jordan and articles on the NCAA itself, on New Orleans, on individual athletes, on championships from prior years, and on the Final Four teams: Georgetown, Houston, Louisville, and North Carolina. Advertisements made up a substantial portion of the program, some of which were placed by national companies. Among the products and services so displayed were Buick automobiles, Miller beer, Texaco motor oil, Fuji film, Maxwell House coffee, Nike sneakers, McDonald's fast food, Coca–Cola soda, Xerox photocopiers, ESPN cable network, and Popeyes Famous Fried Chicken. Other advertisers were local New Orleans merchants. A number of the New Orleans advertisements, including those for restaurants, hotels, and rental cars, apparently were directed at out-of-town tournament attendees. But these advertisements were exceeded in number by those placed by New Orleans/Louisiana companies not specifically related to the tourist industry. Among the local advertisers were the Canal Barge Company, the National Bank of Commerce in Jefferson Parish, Breit Marine Surveying, Inc., Pontchartrain Materials Corp., McDermott Marine Construction, and Tri–Parish Construction & Materials, Inc. *See* rec., exh. 5–E.[4]

The NCAA's total revenue from the 1982 Men's Division I Basketball Championship was $18,671,874. *See* rec., exh. 1–A, at 10 (schedule 2 at 1). The NCAA reported none of this amount as unrelated business taxable income on its federal income tax return for the fiscal year ending August 31, 1982. The Commissioner mailed the NCAA a notice of deficiency in which he determined that the NCAA was liable for $10,395.14 in taxes on $55,926.71 of unrelated business taxable income from the program advertising revenue. The NCAA petitioned the tax court for a redetermination of the deficiency set forth by the Commissioner. The tax court determined that this revenue was unrelated business taxable income, and that it was not excludable from the tax as a royalty.

## II.

■ Under section 7482(a) of the Code, I.R.C. § 7482(a), we review tax court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." This case presents us with neither a purely factual question, to which we apply a clearly erroneous standard, nor a purely legal question, which we consider *de novo. See Love Box Co. v. Commissioner,* 842 F.2d 1213, 1215 (10th Cir.), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). Instead, we must decide a mixed question of law and fact in which "the facts are admitted or established and the law is undisputed; the sole issue is whether the law applied to the facts satisfies the statutory standard." *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986) (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790–91 n. 19, 72 L.Ed.2d 66 (1982)). We apply the clearly erroneous standard where the mixed question is primarily factual, but if it "primarily involves the consideration of legal principles, then a *de novo* review by the appellate court is appropriate." *Id.* at 961. The NCAA's principal objections in this case are to the "conclusions drawn by the tax court in arriving at its determination." *Pollei v. Commissioner,* 877 F.2d 838, 839 (10th Cir.1989). Because "[w]e are equally as able as the tax court to draw conclusions from the undisputed facts presented ..., we review *de novo* the tax court's application of the law to the facts before us." *Id.* (citation omitted).

---

**4.** Only the Final Four program was included in the record, and so we use it as an example. The NCAA's director of public relations testified that the program for the earlier rounds differed very little from the Final Four program. *See* rec., vol. II, at 33.

## III.

Section 511 of the Code imposes a tax on the unrelated business taxable income of exempt organizations. Section 512(a)(1) of the Code defines the term "unrelated business taxable income" as "the gross income derived by any organization from any unrelated trade or business ... regularly carried on by it...." The term "unrelated trade or business" means "any trade or business the conduct of which is not substantially related ... to the exercise or performance by such organization" of its exempt function. I.R.C. § 513(a). Under the heading "Advertising, etc., activities," section 513(c) provides that "the term 'trade or business' includes any activity which is carried on for the production of income from the sale of goods or the performance of services.... [A]n activity does not lose identity as a trade or business merely because it is carried on ... within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization." I.R.C. § 513(c).

█ The NCAA's advertising revenue therefore must be considered unrelated business taxable income if: "(1) It is income from trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt functions." Treas.Reg. § 1.513–1(a); *see also United States v. American College of Physicians*, 475 U.S. 834, 838–39, 106 S.Ct. 1591, 1594–95, 89 L.Ed.2d 841 (1986). If a taxpayer shows that it does not meet any one of these three requirements, the taxpayer is not liable for the unrelated business income tax. *See Veterans of Foreign Wars v. Commissioner*, 89 T.C. 7, 19–20 (1987).

█ The NCAA concedes that its program advertising was a "trade or business" not "substantially related" to its ex-

empt purpose. The only question remaining, therefore, is whether the trade or business was "regularly carried on" by the organization. The meaning of the term "regularly carried on" is not defined by the language of the statute. Accordingly, we turn to the Treasury Regulations for assistance.[5]

Section 1.513–1(c) of the Treasury Regulations provides a discussion of the phrase "regularly carried on." The general principles set out there direct us to consider "the frequency and continuity with which the activities productive of the income are conducted *and* the manner in which they are pursued." Treas.Reg. § 1.513–1(c)(1) (emphasis added). As a cautionary note, the regulations emphasize that whether a trade or business is regularly carried on must be assessed "in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete." *Id.*

The regulations then move beyond the general principles and set out a process for applying the principles to specific cases. The first step is to consider the normal time span of the particular activity, and then determine whether the length of time alone suggests that the activity is regularly carried on, or only intermittently carried on. *See id.* § 1.513–1(c)(2)(i). If the activity is "of a kind normally conducted by nonexempt commercial organizations on a *year-round* basis, the conduct of such [activity] by an exempt organization over a period of only a few weeks does not constitute the regular carrying on of trade or business." *Id.* (emphasis added). As an example of a business not regularly carried on, the regulations describe a hospital auxiliary's operation of a sandwich stand for only two weeks at a state fair. In contrast, the regulations deem the operation of a commercial parking lot every Saturday as a regularly-carried-on activity. *Id.*

---

5. We of course accord the Treasury Regulations deference unless they are unreasonable or plainly inconsistent with the Code. *See Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). Neither party challenges the validity of the regulations, and both argue that they provide the analytical framework for our inquiry here.

If the activity is "of a kind normally undertaken by nonexempt commercial organizations only on a *seasonal* basis, the conduct of such activities by an exempt organization during a *significant portion* of the season ordinarily constitutes the regular conduct of trade or business." *Id.* (emphasis added). The operation of a horse racing track several weeks a year is an example of a regularly-conducted seasonal business, because such tracks generally are open only during a particular season. *Id.*

■ A primary point of contention in this case is whether the NCAA's advertising business is normally a seasonal or year-round one, and whether it is intermittent or not. The tax court noted that the Commissioner looked at the short time span of the *tournament,* concluded that it was as much a "seasonal" event as the operation of a horse racing track, and then argued that the time involved in the tournament program advertising made it a regularly carried on business. The court observed that the NCAA, which did not agree with the Commissioner's "season" conclusion, also focused on the tournament itself in contending that the event's short time span made the activity in question intermittent.[6] The tax court rejected these arguments as "plac[ing] undue emphasis on the tournament itself as the measure for determining whether petitioner regularly carried on the business at issue.... Although sponsorship of a college basketball tournament and attendant circulation of tournament programs are seasonal events, the 'trade or business' of selling advertisements is not." Rec., vol. I, doc. 13, at 15–16.

We agree that to determine the normal time span of the activity in this case, we should consider the business of *selling advertising space,* since that is the business the Commissioner contends is generating unrelated business taxable income. There is no dispute that the tournament itself is substantially related to the NCAA's exempt purpose and so, unlike the horse racing track, it should not be the business activity in question. *See American Col-*

*lege of Physicians,* 475 U.S. at 839, 106 S.Ct. at 1594–95 ("Congress has declared unambiguously that the *publication of paid advertising* is a trade or business activity *distinct* from the publication of accompanying ... articles") (emphasis added). Since the publication of advertising is generally conducted on a year-round basis, we conclude that if the NCAA's sale of program advertising was conducted for only a few weeks, that time period could not, standing alone, convert the NCAA's business into one regularly carried on.

In regard to the question of how long the NCAA conducted its advertising business, the tax court stated that "[i]t is inappropriate to decide whether the trade or business at issue is regularly carried on solely by reference to the time span of the tournament itself." Rec., vol. I, doc. 13, at 15–16. The tax court, observing that the agency relationship between the NCAA and Host allowed the court to attribute Host's activities to the NCAA, noted that the NCAA had "not produced any evidence ... regarding the extent or manner of Host's conduct in connection with the solicitation, sale, and publication of advertising for the tournament programs." *Id.* at 18. The court went on to conclude that "[w]ithout such evidence [the NCAA] has not proven that neither it nor Host carried on the activity of selling program advertising regularly. [The tax court] will not assume Host's conduct in this regard was infrequent or conducted without the competitive and promotional efforts typical of other commercial endeavors." *Id.* We believe the tax court focused its analysis in the wrong direction.

The tax court held, and the Commissioner argues, that the amount of preliminary time spent to solicit advertisements and prepare them for publication is relevant to the regularly-carried-on determination, and that the length of the tournament is not relevant. This position is contrary to the regulations and to existing case law. The language of the regulations alone suggests that preparatory time should not be considered. The sandwich stand example in

**6.** On appeal, the Commissioner and the NCAA   make essentially the same arguments.

the regulations, for instance, included a reference only to the two weeks it was operated at the state fair. *See* Treas.Reg. § 1.513–1(c)(a)(i). The regulations do not mention time spent in planning the activity, building the stand, or purchasing the alfalfa sprouts for the sandwiches.

The case closest to the one here also does not evaluate preparatory time. In that case, *Suffolk County Patrolmen's Benevolent Ass'n v. Commissioner*, 77 T.C. 1314 (1981), an exempt organization staged a professional vaudeville show every year as a fundraising event, using a company with which it had contracted. The organization derived the vast majority of its receipts from the sale of advertising in a program guide distributed to show patrons and to anyone who requested it. The shows generally consisted of three or four performances stretching over two weekends. The tax court found that preparation for the shows and the program, including the solicitation of advertisements, lasted eight to sixteen weeks, but it then emphasized that

> "nowhere in the regulations or the legislative history of the tax on unrelated business income is there any mention of time apart from the duration of the event itself.... The fact that an organization seeks to insure the success of its fundraising venture by beginning to plan and prepare for it earlier should not adversely affect the tax treatment of the income derived from the venture."

*Id.* at 1323–24.

As in *Suffolk County*, the advertising here was solicited for publication in a program for an event lasting a few weeks. The NCAA did put on evidence as to the duration of that event. While the length of the tournament is irrelevant for purposes of assessing the normal time span of the business of selling advertising space, we hold that, contrary to the tax court's conclusion, the tournament must be considered the actual time span of the business activity sought to be taxed here. The length of the tournament is the relevant time period

because what the NCAA was selling, and the activity from which it derived the relevant income, was the publication of advertisements in programs distributed over a period of less than three weeks, and largely to spectators.[7] Obviously, the tournament is the relevant time frame for those who chose to pay for advertisements in the program. This case is unlike *American College of Physicians*, 475 U.S. at 836, 106 S.Ct. at 1593, where advertisements were sold for each issue of a monthly medical journal. Accordingly, we conclude that the NCAA's involvement in the sale of advertising space was not sufficiently long-lasting to make it a regularly-carried-on business solely by reason of its duration.

The next step of the regulation's analysis is to determine whether activities which are intermittently conducted are nevertheless regularly carried on by virtue of the manner in which they are pursued. In general, according to the regulations, "exempt organization business activities which are engaged in only discontinuously or periodically will not be considered regularly carried on if they are conducted without the competitive and promotional efforts typical of commercial endeavors." Treas.Reg. § 1.513–1(c)(2)(ii). As an example of an activity not characteristic of commercial endeavors, the regulations refer to "the publication of *advertising in programs for sports events* or music or drama performances." *Id.* (emphasis added). The NCAA places considerable emphasis on this latter sentence and criticizes the tax court, which stated only that there was insufficient evidence from which the court could draw conclusions on the manner of Host's conduct of its advertising activities. As the NCAA stresses, the tax court did not distinguish the 1982 Basketball Championship from the "sports events" referred to in the regulation above.

On appeal, the Commissioner initially agreed with the tax court that the record was devoid of evidence with which the

---

**7.** There was testimony that some programs also were sold to members of the public not attending the tournament, but who wanted the program as a souvenir of the tournament. *See*

*Suffolk County Patrolmen's Benevolent Ass'n v. Commissioner*, 77 T.C. 1314, 1317 (1981) (vaudeville show program made available to any non-patron who requested it).

NCAA could show that Host's efforts were not of a sufficiently competitive and promotional nature. But the Commissioner then went on to focus on the Final Four program, a part of the record. He characterized the program's advertisements as "typical print media advertisements," and distinguished them from the advertisements in the vaudeville show programs, which "'more closely resembled complimentary contributions than commercial selling agents.'" Appellee's Brief at 27 (quoting *Suffolk County*, 77 T.C. at 1322). The sentence referring to sports events in the regulations was, according to the Commissioner, directed more at advertising in high school sports programs than at the type of advertising in the program here.

Addressing first the tax court's conclusion, we fail to see what evidence in addition to the advertisements themselves the tax court could require. The regulations discuss the business of advertising but refer only to advertisements published in programs, and not to any efforts to secure the advertisements. In *Suffolk County*, the tax court disregarded all but the advertisements themselves and stated that it is "entirely reasonable for an exempt organization to hire professionals in an effort to insure the success of a fundraiser, and there are no indications [in the applicable statutes and regulations] ... that the use of such professionals would cause an otherwise infrequent intermittent activity to be considered regularly carried on." 77 T.C. at 1323.

The Commissioner's assertion that the advertisements themselves are of a commercial nature deserves more discussion. It is true that a number of the advertisements are virtually indistinguishable from those that might appear in magazines like *Sports Illustrated.* A substantial number of other advertisements, however, particularly those placed by Louisiana companies not engaged in the tourist industry, seem to us to resemble more closely the "complimentary contributions" of *Suffolk County.*

The difficult question of whether the NCAA's advertising is of the type envisioned as commercial in nature, or instead

as consistent with that connected to the "sports events" referred to in the regulations, is not one which we must answer now, however. For the final step in the process spelled out by the regulations requires us to consider whether, promotional efforts notwithstanding, an intermittent activity occurs "so infrequently that neither [its] recurrence nor the manner of [its] conduct will cause [it] to be regarded as trade or business regularly carried on." Treas.Reg. § 1.513–1(c)(2)(iii). We conclude that the advertising here is such an infrequent activity. The programs containing the advertisements were distributed over less than a three-week span at an event that occurs only once a year. We consider this to be sufficiently infrequent to preclude a determination that the NCAA's advertising business was regularly carried on.

Our conclusion is buttressed by the regulation's admonition that we apply the regularly-carried-on test in light of the purpose of the tax to place exempt organizations doing business on the same tax basis as the comparable nonexempt business endeavors with which they compete. *See* Treas.Reg. § 1.513–1(c)(1). The legislative history of the unrelated business income tax also convinces us that we must consider the impact an exempt organization's trade or business might have on its competition. The tax was a response to the situation prevailing before 1950, when an exempt organization could engage in any commercial business venture, secure in the knowledge that the profits generated would not be taxed as long as the *destination* of the funds was the exempt organization. The *source* of those funds did not affect their tax status. *See, e.g., Trinidad v. Sagrada Orden de Predicadores,* 263 U.S. 578, 581, 44 S.Ct. 204, 205, 68 L.Ed. 458 (1924); *C.F. Mueller Co. v. Commissioner,* 190 F.2d 120, 121 (3rd Cir.1951); *see also American College of Physicians,* 475 U.S. at 837–38, 106 S.Ct. at 1593–94. As more and more exempt organizations began acquiring and operating commercial enterprises, there were rumblings in Congress to do away with the perceived advantage enjoyed by these organizations. The case which most forcefully

brought this point home was that involving the C.F. Mueller Co. That company, a leading manufacturer of macaroni products, was in 1947 acquired and organized for the purpose of benefitting the New York University's School of Law, a tax-exempt educational institution.[8] *See C.F. Mueller*, 190 F.2d at 121. This acquisition prompted an outcry from a number of sources.

In President Truman's 1950 message to Congress, for example, he stated that " 'an exemption intended to protect educational activities has been misused in a few instances to gain competitive advantage over private enterprise through the conduct of business ... entirely unrelated to educational activities.' " Kaplan, *Intercollegiate Athletics and the Unrelated Business Income Tax*, 80 Colum.L.Rev. 1430, 1433 (1980) (quoting Message of the President, 96 Cong.Rec. 769, 771 (1950)). Primarily to "restrain the unfair competition fostered by the tax laws," *American College of Physicians*, 475 U.S. at 838, 106 S.Ct. at 1594 (citing H.R.Rep. No. 2319, 81st Cong., 2d Sess., 36–37 (1950)), Congress imposed a tax on the business income of exempt organizations, but only on that income substantially unrelated to the organization's exempt purposes.[9] *See* Revenue Act of 1950, Pub.L. No. 814, § 301, 64 Stat. 906, 947.

■ Although we have observed that the purpose of the unrelated business income tax was to prevent unfair competition[10] between companies whose earnings are taxed and those whose are not, it is not necessary to prove or disprove the existence of actual competition. *See United States v. American Bar Endowment*, 477 U.S. 105, 114–15, 106 S.Ct. 2426, 2431–32, 91 L.Ed.2d 89 (1986); *Louisiana Credit*, 693 F.2d at 541. But analyzing the business in question in terms of its possible effect on prospective competitors helps to explain why an activity can occur "so infrequently" as to preclude a designation as a business regularly carried on. While the operation of a parking lot on a weekly basis occurs sufficiently frequently to threaten rival parking lot owners, the hospital auxiliary's annual sandwich stand is too infrequent a business to constitute a threat to sandwich shop owners. The competition in this case is between the NCAA's program and all publications that solicit the same advertisers. The competition thus includes weekly magazines such as *Sports Illustrated* and other publications which solicit automobile, beverage, photocopier, and fried chicken advertisements, to name a few. Viewed in this context, we conclude that the NCAA program, which is published only once a year, should not be considered an unfair competitor for the publishers of advertising. Application of the unrelated business tax here therefore would not further the statutory purpose.

**8.** New York University also owned a leather company and chinaware manufacturing operations. Other educational institutions operated a number of enterprises: automobile parts, cotton gins, oil wells, theaters, an airport, a radio station, a hydroelectric plant, haberdasheries, citrus groves, and cattle ranches. *See* Kaplan, *Intercollegiate Athletics and the Unrelated Business Income Tax*, 80 Colum.L.Rev. 1430, 1432 & n. 8 (1980).

**9.** Although prevention of unfair competition was the main purpose behind the unrelated business income tax, revenue raising concerns also played a role in Congress' actions, for Congress feared that exempt organizations, with a tax-induced competitive advantage, would drive other enterprises out of business. Congress believed this would mean that " '[e]ventually all the noodles produced in this country will be produced by corporations held or created by universities ... and there will be no revenue to

the Federal Treasury from this industry. That is our concern.' " Kaplan, 80 Colum.L.Rev. at 1433 (quoting Revenue Revision of 1950: Hearings Before the House Comm. on Ways and Means, 81st Cong., 2d Sess. 580 (1950) (remarks of Rep. Dingell)); *see also Louisiana Credit Union League v. United States*, 693 F.2d 525, 540–41 (5th Cir.1982).

**10.** The term "unfair competition" is the hallmark of the unrelated business income tax, but the content of that term has been called into question. As one commentator has noted, "different tax treatment ... implies only that N.Y.U. would keep a larger share of Mueller's profits than would Ronzoni's owners.... Why must a fair tax code treat students and scholars who are the beneficiaries of Mueller's profits as if they were 'equal to' Ronzoni's investors?" Rose–Ackerman, *Unfair Competition and Corporate Income Taxation*, 34 Stan.L.Rev. 1017, 1020 (1982).

**1426**

We hold that the NCAA's advertising business was not regularly carried on within the meaning of the Code.

The decision of the tax court is REVERSED.