T.C. Memo. 1996-407


UNITED STATES TAX COURT


STATE POLICE ASSOCIATION OF MASSACHUSETTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15443-93.                    Filed September 4, 1996.


<u>Alfred J. O'Donovan III</u>, for petitioner.

<u>Catherine R. Chastanet</u> and <u>Christopher W. Schoen</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes, additions to tax, and
penalties for the taxable years as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | | Secs. | Secs. | |
| TYE | | Sec. | 6653(a)(1)/ | 6653(a)(2)/ | Sec. |
| April 30 | Deficiency | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
| 1986 | $214,988 | $53,747 | $10,749 | [1] | $53,747 |
| 1987 | 238,492 | 59,623 | 11,925 | [1] | 59,623 |
| 1988 | 266,342 | 66,585 | 13,317 | [1] | 66,585 |
| 1989 | 239,264 | 59,816 | 11,963 | [1] | 59,816 |

| | | Additions to Tax and Penalties | | | |
|---|---|---|---|---|---|
| TYE | | Sec. | Sec. | Sec. | Secs. |
| July 31 | Deficiency | 6651(a)(1) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661/6662 |
| 1989 | $57,636 | $14,409 | $2,882 | [1] | $14,409 |
| 1990 | 180,366 | 45,901 | – | – | 36,073 |
| 1991 | 155,345 | 38,836 | – | – | 31,069 |

[1] 50 percent of the interest due on the deficiency.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided are:

1. Whether the period of limitations on assessment and collection had expired with respect to certain of the taxable periods in issue at the time respondent sent to petitioner the statutory notice of deficiency in issue in the instant case;

2. whether income generated by petitioner's solicitation program for its yearbook is unrelated business income subject to tax pursuant to section 511 for the taxable periods in issue; and

3. whether petitioner is liable for additions to tax pursuant to sections 6651(a)(1), 6653(a)(1) and (2), 6653(a)(1)(A) and (B), and 6661(a), and penalties pursuant to section 6662(a) for certain of the taxable periods in issue.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91 and are incorporated herein by reference. We find as facts the parties' stipulations of fact.

Petitioner is a labor organization exempt from taxation pursuant to section 501(c)(5). Petitioner's principal office, at the time of the filing of the petition in the instant case, was 388 Hillside Avenue, Needham, Massachusetts.

The purpose of petitioner is: (1) To represent and act as bargaining agent in matters of policy, wages, hours, and other conditions of employment, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, of and for the members of the Uniformed Branch of the Division of State Police, Department of Public Safety, of the Commonwealth of Massachusetts, and (2) to promote and develop a friendly and fraternal spirit among all of the members of the Uniformed Branch of the Division of State Police.

Approximately 1,100 to 1,300 State troopers were eligible to join petitioner during each of the taxable years in issue. Nearly all those who were eligible to be members were members. The Constabulary was the official publication of petitioner and was intended for both internal and external use. The Constabulary was characterized as petitioner's "yearbook" or "ad-book".

Agreements

Petitioner entered into a contract with Brent-Wyatt East (BWE), on January 22, 1982 (1982 Agreement), in which BWE agreed to conduct an "earnings" program (the Program) for petitioner.

The 1982 Agreement provided that:

(i)  Its term would be for 3 years from January 1, 1982, but would terminate upon written notice by one party to the other of breach and the failure of the defaulting party to cure the breach within 15 days of receipt of the notice;

(ii)  BWE agreed to conduct the Program by "marketing advertising" on behalf of petitioner through a telephone solicitation and to produce, publish, and lay out at least 1,000 yearbooks;

(iii)  petitioner would receive 41 percent of gross weekly collections and any amounts left after all Program obligations have been met but not less than $100,000 for each solicitation, which was to occur annually;

(iv)  BWE would receive 7 percent of gross weekly collections;

(v)  telephone salesmen, field representatives, and office managers, who worked for both petitioner and BWE, would receive 31.5 percent of gross weekly collections;

(vi)  the parties would receive amounts due them at weekly settlement meetings;

(vii) all checks received as a result of the solicitation would be made payable to petitioner and turned over to the office manager or trooper monitor on duty; any check received that was not made payable to petitioner would be returned to its maker;

(viii) daily reports of collected funds would be maintained and submitted weekly to petitioner's treasurer;

(ix) petitioner would maintain a separate checking account, and all expenses incurred directly from the solicitation and approved by petitioner and BWE would be paid from that account;

(x) BWE would be an independent contractor and not the agent of petitioner; petitioner would have no direction or control over BWE's personnel or business activities, and BWE would save petitioner harmless from any liability resulting from BWE's business activities; BWE could not incur indebtedness or expenses in the name of petitioner;

(xi) petitioner would provide a monitor (Trooper Monitor) who would be present at all times during the telephone solicitation;

(xii) petitioner would provide an editing staff for the yearbook;

(xiii) BWE would supply the marketing personnel, but petitioner had the right to terminate the employment of any employee or subcontractor found to be using pressure or misrepresentation;

(xiv) during the Program, BWE had authority to use petitioner's name, and petitioner insured the cooperation of itself and its members;

(xv) petitioner had the right at any time to exempt any subscriber, prospective subscriber or advertiser for any reason whatsoever;

(xvi) petitioner had the right to inspect any field office from which the solicitation took place at any time without prior notice to determine whether BWE was fulfilling its obligation under the Agreement;

(xvii) petitioner had the right to demand that written notices be placed in a conspicuous place at BWE's offices, and no office could operate without such notices;

(xviii) BWE would keep daily logs which contained specific information and would advise all police departments in the area of an ongoing solicitation;

(xix) petitioner's trooper representatives had the right to accept or reject the office space to be used by BWE for the solicitation;

(xx) solicitations for the earnings program could be made only by telephone.

By Memorandum of Agreement dated October 17, 1984, petitioner and BWE agreed that there would be no termination date

for the 1982 Agreement, and that the Agreement would run until voluntarily terminated by one of the parties.

Petitioner entered into a contract with BWE on January 1, 1988, (1988 Agreement) which had terms similar to the 1982 Agreement, as amended, except that:

(i)  the 1988 Agreement would continue indefinitely but would terminate upon written notice by one party to the other of breach and the failure of the defaulting party to cure the breach within 15 days of receipt of the notice;

(ii)  petitioner would receive 42 percent of gross weekly collections and any amounts left after all Program obligations have been met but not less than $100,000 for each solicitation, which was to occur annually;

(iii)  telephone salesmen, field representatives, and office managers would receive 30.5 percent of gross weekly collections;

(iv)  the 1988 Agreement would terminate upon an uncured breach by one party.

Petitioner entered into a contract with R.H. McKnight Co., Inc. (McKnight), on June 20, 1990 (1990 Agreement), which had terms similar to the 1982 Agreement, as amended, and the 1988 Agreement, except that:

(i)  McKnight replaced BWE;

(ii)  reference to yearbooks was deleted, and terms referring to a program guide which was to be distributed in

connection with an annual road race known as the "State Police Chase" were inserted;

(iii) reference to telephone salesmen, field representatives, and office managers was deleted, and a provision was inserted which provided that persons employed by McKnight for the purposes of soliciting funds would be paid 27.5 percent of funds resulting from such persons' solicitations.

Telephone Solicitations

BWE and McKnight described their business as publishing and sales. BWE or McKnight employed a subcontractor to conduct a solicitation campaign during each of the years in issue pursuant to the Agreements.

Each campaign consisted of telephone solicitations in which 8 to 12 callers called businesses located in the Commonwealth of Massachusetts. Individual residences were not solicited.

Telephone solicitors used a stock solicitation format that prompted the solicitor to tell the person called that the solicitor was calling on behalf of the State Police Association of Massachusetts; that the Troopers were putting together their annual business to business directory; that the caller was calling local businesses to show support for the State Police Association by purchasing a sponsorship in a book; and that money derived from the solicitation is used to improve working conditions for the membership.

Telephone solicitations were conducted during normal business hours 5 days per week, except on those days on which an evening solicitation was conducted, when solicitations began at 12 noon. Telephone solicitations were conducted approximately 46 weeks per year. Telephone solicitations were monitored by a member of petitioner (the Trooper Monitor) to answer questions, if necessary, and to ensure that the solicitation did not involve coercion, fraud, or duress. Businesses which were solicited by telemarketers could have made a contribution to petitioner without having their name or any other identifying statement appear in print in The Constabulary. Each year, only five or six businesses that were solicited pursuant to the earnings program contributed money to The Constabulary without being recognized by name in The Constabulary.

In operation, petitioner exercised substantial control over BWE and McKnight. Petitioner set the office hours for advertisement solicitations for The Constabulary; set rules for depositing gross receipts and returning bad checks; monitored the use of telephones for personal calls by ad sellers; required BWE and McKnight office managers to be present at weekly reconciliation meetings; demanded to be advised of any problems; demanded the names of all telephone solicitors; required BWE and McKnight to maintain personal data files on all employees; and geographically limited the areas to which advertisement solicitations could be made.

BWE and McKnight are considered professional fund raisers under the Massachusetts Charitable Solicitation Act.

Collection and Accounting for Funds

When a business agreed to make a "payment" to petitioner, the telephone solicitor made a notation on an envelope itemizing the business, its address, the person he spoke with, and the amount of the payment. The envelope was delivered by a delivery service, such as United Parcel Service (UPS), to the business, which delivered a check to the UPS messenger, who returned it to the solicitation office.

Checks received by the solicitation office were made payable to petitioner and were deposited in a bank account owned by petitioner. When checks came into The Constabulary office, they were counted and deposited in petitioner's bank account by the office manager and a trooper. BWE and McKnight or its subcontractor, Mr. Norman Berube, accounted for all receipts directly to petitioner.

Amounts collected were distributed at the weekly meetings according to the Agreements between petitioner and BWE or McKnight and the weekly settlement reports.

Publication of The Constabulary

Pursuant to the Agreements, BWE and McKnight published The Constabulary once in each year in issue. The Constabulary was published in five editions: Troop A, Troop A Greater Boston, Troop B, Troop C, and Troop D.

In each year, the following numbers of copies of The Constabulary were printed:

| Year | Troop A | Troop A Boston | Troop B | Troop C | Troop D |
|------|---------|----------------|---------|---------|---------|
| 1986 | 1,000 | 800 | 900 | 1,150 | 1,350 |
| 1987 | 1,100 | 800 | 1,100 | 1,250 | 1,350 |
| 1988 | 1,500 | 800 | 1,300 | 1,400 | 1,500 |
| 1989 | 2,000 | 600 | 1,400 | 1,500 | 1,500 |
| 1990 | 2,000 | 600 | 1,400 | 1,500 | 1,500 |
| 1991 | 2,000 | 600 | 1,400 | 1,500 | 1,500 |

The Constabulary was printed in two sections, the common section and the Display Ad section. The common section contained, during each year in issue, articles and editorials that were identical in each of the five editions. Additional material, other than articles and editorials, was common to every edition. The material other than articles and editorials that was not common to every edition related to businesses which were located within the geographic location of the troop.

The Display Ad section contained display ads and listings. The display ads (displays), which are indexed in alphabetical order in an "Advertiser's Index" or "Index to Display Ads" in the back of each edition of The Constabulary, consisted of messages covering from one-sixth of one page to a full page. The display ads contained blocking, illustrations, signatures, trademarks, and emblems. The display ads included such well-known companies or products as McDonald's, AT&T Corp., John Hancock, Sheraton Hotels, Mobil Oil Corp., Kentucky Fried Chicken, Rockport, and AAMCO Transmissions. Some of the display ads contained well-

known slogans that sponsors also used in their national advertising.

The listings were placed after the displays in a section entitled "Business Directory".  The Business Directory in The Constabulary for the 1986 through 1991 editions consisted of two- or three-line listings of various businesses by name, telephone number (except for 1991), and address (city and State only), arranged alphabetically by type of business.

The beginning of each business directory in each edition of The Constabulary published for the years 1986 through 1991 states:

> ON THE FOLLOWING PAGES, listed by category of
> service or product, are advertisers who
> support the State Police Association of
> Massachusetts.  We urge you to consider these
> fine companies when making purchases for
> yourself or your family.

Each 1986 and 1987 edition of The Constabulary contains "A Message from the President..." of petitioner which states:

> As president of the State Police
> Association of Massachusetts, I am proud to
> announce this year's edition of The
> Constabulary.  This book is an attempt to
> showcase what the functions of the
> Massachusetts State Police are all about, and
> I hope that the readers will find it
> enjoyable.
> As in the past, this book is made
> possible by the generous contributions of
> those who advertise in it.  It is our hope
> that the reader will make use of such
> advertisements and solicit the establishments
> herein.

The content of editorials and articles published in The Constabulary was determined by the editorial staff of troopers. Most of the articles in The Constabulary were written by troopers who were editors.  Trooper editors reviewed every article and editorial before it was published.

Distribution of The Constabulary

In each year, approximately 300 to 400 copies of The Constabulary were distributed to attendees of the State Police Chase, an annual picnic and sports day, and approximately 1,000 copies were hand-carried to trooper barracks over the course of a couple of weeks for distribution to members of petitioner.  Each year the remaining copies of The Constabulary were delivered to businesses.  In some, but not all instances, copies of The Constabulary were sent to particular businesses to verify that petitioner, and not some other organization, published the book.

During the years in issue, The Constabulary, however, was not arranged as a program guide for the annual State Police Chase sporting event.  The 1986, 1987, and 1988 editions of The Constabulary do not mention the State Police Chase, and in the 1989, 1990, and 1991 editions, the two- or three-page articles on the State Police Chase relate to the previous year's event.  The Constabulary was never sold to anyone for a charge.

Revenues

Petitioner received approximately the following gross amounts from displays:

| Year | Amount |
|------|--------|
| 1986 | $265,400 |
| 1987 | 565,700 |
| 1988 | 529,000 |
| 1989 | 440,000 |
| 1990 | 339,300 |
| 1991 | 370,500 |

Petitioner received approximately the following gross amounts from listings:

| Year | Amount |
|------|--------|
| 1986 | $1,085,300 |
| 1987 | 1,043,300 |
| 1988 | 1,070,400 |
| 1989 | 1,009,600 |
| 1990 | 805,700 |
| 1991 | 790,800 |

Operations

Petitioner had total income and expenses relating to The Constabulary for the taxable periods in issue as follows:[1]

| Year Ending | Constabulary Income | Constabulary Expenses |
|-------------|---------------------|------------------------|
| Apr. 30, 1986 | $1,244,241 | $731,854 |
| Apr. 30, 1987 | 1,344,752 | 781,270 |
| Apr. 30, 1988 | 1,693,025 | 942,884 |
| Apr. 30, 1989 | 1,589,793 | 885,075 |
| July 31, 1989 | 408,176 | 216,442 |
| July 31, 1990 | 1,312,635 | 740,706 |
| July 31, 1991 | 1,195,589 | 737,692 |
| Total | 8,788,211 | 5,035,923 |

---

[1]     The Constabulary income amounts, which are reported on a fiscal year basis, differ from the gross amounts from displays and listings, which are compiled on a calendar year basis.

Petitioner used a price list in its solicitation program for The Constabulary. BWE and McKnight set the prices for the various sized displays and listings with petitioner's approval. Petitioner's president, Kevin W. Regan, sent letters advising recipients that petitioner was "selling advertising in the next edition of The Constabulary yearbook". In its letter, petitioner set forth its price list for different sizes of "advertisements." Petitioner advised prospective advertisers that the "prices" for advertisements in The Constabulary were as follows:

<u>Display Advertisements</u>

| | |
|---|---|
| Full page | $995 |
| 3/4 page | 850 |
| 1/2 page | 595 |
| 1/3 page | 450 |
| 1/4 page | 395 |
| 1/6 page | 295 |

<u>Directory Advertisements</u>

| | |
|---|---|
| Large bordered | $195 |
| Small bordered | 135 |
| 3-line listing | 95 |
| 2-line listing | 55 |

<u>Period of Limitations</u>

By letter dated May 21, 1992, petitioner's representative agreed to execute on behalf of petitioner a Consent to Extend the Time to Assess Tax (Form 872) to allow the assessment of additional Federal income tax to occur on or before December 31, 1992, for the periods ended April 30, 1986 through 1989, and July 31, 1989.

- 16 -

Petitioner and respondent by their authorized representatives executed a Consent to Extend the Time to Assess Tax (Form 872) on August 3, 1992.  The first page of the Form 872 stated, in pertinent part, as follows:

<u>          State Police Assoc. of Massachusetts          </u>
                              (Name(s))

taxpayer(s) of <u>     388 Hillside Ave.  Needham, Ma. 02194     </u>
                    (Number, Street, City or Town, State, ZIP Code)

and the District Director of Internal Revenue or Regional Director of Appeals consent and agree to the following:

   (1)  The amount of any Federal <u>     Income ~~Excise~~[2]     </u> tax due on any
                                              (Kind of Tax)

return(s) made by or for the above taxpayer(s) for the period(s) ended

<u>          April 30, 1986, 1987, 1988, 1989 and July 31, 1989          </u>

may be assessed at any time on or before <u>     April 30, 1993     </u>.  However, if
                                                (Expiration Date)

a notice of deficiency in tax for any such period(s) is sent to the taxpayer(s) on or before that date, then the time for assessing the tax will be further extended by the number of days the assessment was previously prohibited, plus 60 days.

The only returns filed by petitioner for the periods ended April 30, 1986 through 1989, and July 31, 1989, were Returns of Organization Exempt from Income Tax (Form 990).

OPINION

<u>Jurisdiction</u>

The first issue we must decide is whether the period of limitations on assessment had expired with respect to certain of

---

[2]     Petitioner's representative modified the executed Form 872 by deleting the reference to excise tax.  A group manager in the exempt organizations portion of the EPEO division of the Brooklyn District executed petitioner's modified Form 872 on behalf of respondent on Aug. 3, 1992.

the taxable periods in issue prior to the date respondent sent the notice of deficiency in issue in the instant case to petitioner. Pursuant to section 6501(g)(2),[3] the good faith filing of a Form 990 by an exempt organization commences the running of the period of limitations against assessment of tax on unrelated business income if the organization is later held to be a taxable organization. California Thoroughbred Breeders Association v. Commissioner, 47 T.C. 335, 339 (1966). Because petitioner pled the bar of the statute of limitations, petitioner must show that the statutory notice was issued beyond the normally applicable period of limitations. In Adler v. Commissioner, 85 T.C. 535, 540 (1985), we stated:

> The bar of the statute of limitations is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proof with respect thereto. Rules 39, 142(a). Where the party pleading such issue makes a showing that the statutory notice was issued beyond the normally applicable statute of limitations, however, such party has established a prima facie case. At that point, the burden of going forward with the evidence shifts to the other side, and the other party has the burden of introducing evidence to show that the bar of the statute is not applicable. Where the other party makes such a showing, the burden of going forward with the evidence then shifts back to the party pleading the

---

[3] Sec. 6501(g)(2) provides:

If a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization for purposes of this section.

statute, to show that the alleged exception is invalid or otherwise not applicable. The burden of proof, i.e., the burden of ultimate persuasion, however, never shifts from the party who pleads the bar of the statute of limitations. [Citations omitted.]

In the instant case, on November 13, 1989, petitioner filed Returns of Organization Exempt from Income Tax (Forms 990) for the periods ended April 30, 1986 through 1989, and July 31, 1989. Petitioner did not file Forms 990-T for unrelated business income tax for those periods. Respondent's statutory notice was issued on April 22, 1993.

Petitioner contends that it determined in good faith that it was an exempt organization, had no taxable income, and therefore was not required to file any return other than Form 990. Accordingly, petitioner argues that section 6501(g) applies to commence the running of the period of limitations for the purposes of the Form 990-T and that, because the Form 872 that petitioner signed referred only to "return(s) made", the Form 872 did not extend the period of limitations.

In the instant case, we need not decide whether petitioner's filing of a Form 990 commenced the running of the period of limitations against assessment of the unrelated business income tax determined by respondent because, even if we were to so hold, we conclude that the Form 872 signed by the parties effectively extended that period of limitations. Petitioner argues that, because the Form 872 applies only to "return(s) made" by

petitioner and because "No tax was due or could be due on the returns filed by the Petitioner for the applicable periods", the Form 872 does not extend the period of limitations to assess tax. Petitioner, however, concedes:

> it intended to extend the period in which the Respondent was required to assess a tax for unrelated business income for the periods ended April 30, 1986, April 30, 1987, April 30, 1988, April 30, 1989 and the three-month period ended July 31, 1989 (the "applicable periods") or issue a notice of deficiency to the Petitioner.

As we construe the parties' use of the language "income tax due on any return(s) made by or for the above taxpayer(s)", we think it is broad enough to include a return deemed made pursuant to section 6501(g)(2); i.e., a Form 990-T.[4] We therefore hold that the parties duly extended until April 30, 1993, the period of limitations within which respondent could assess deficiencies in petitioner's unrelated business income tax for the periods in issue. The notice of deficiency was mailed to petitioner before that date, and consequently the limitations period remains open.

---

[4] Even if the language could not be construed to include a deemed return, we would conclude that the Form 872 could be reformed. Where a written agreement does not conform with the actual agreement between the parties, the Court may reform the writing to conform with the parties' intentions. Woods v. Commissioner, 92 T.C. 776, 782 (1989). In light of petitioner's concession concerning its intent to extend the period of limitations, the Form 872 may properly be reformed to conform to the agreement and intent of the parties. The evidence is clear and convincing that the parties intended to extend the period of limitations with respect to returns made as well as those "deemed made" by reason of sec. 6501(g)(2).

Unrelated Business Income

The next issue we must decide is whether the income generated from petitioner's solicitation program for The Constabulary is unrelated business income subject to tax pursuant to section 511. Petitioner argues that it merely solicited contributions and did not engage in the business of selling advertising. Respondent contends that petitioner's solicitation of displays and listings in The Constabulary constituted the sale of advertising as a trade or business.

We first examine whether petitioner sold "advertising". The Code and the regulations do not provide a definition of the term "advertising" or "advertisement". In Fraternal Order of Police v. Commissioner, 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987), we examined whether listings similar to those in the instant case constituted "advertising". In Fraternal Order of Police, an organization exempt from tax pursuant to section 501(c)(8) published The Trooper magazine, which contained articles relating primarily to the duties of police officers, and two types of listings: (1) "large listings", which contained the usual elements associated with advertisements, such as blocking, illustrations, signatures, trademarks, and emblems, and (2) a business directory, which classified and arranged the listers in the same manner as the yellow pages of a telephone directory. Id. at 750. The Trooper also had an "Advertisers' Index"

containing the name of the sponsor of each large listing and the page upon which its listing was located.  Those sponsors included well-known companies such as American Airlines and Midas Mufflers.

In Fraternal Order of Police, after examining the record and copies of The Trooper magazine, we were "convinced that both the larger listings and the business listings constitute 'advertising.'"  Id. at 754.  We stated:

> To conclude otherwise we would have to ignore the fact that the vast majority of the listings in The Trooper are composed of slogans, logos, trademarks, and other information which is similar, if not identical in content, composition, and message to the listings found in other professional journals, newspapers, and the "yellow pages" of telephone directories.  We also note that the contracts with OSC, FOP's business forms, and the magazine itself repeatedly use such words and phrases as "advertising revenues," "advertisers," "prospective advertisers," "advertising marketing program," and "advertising," to describe the listings and related activities.  [Id.]

Petitioner argues that Fraternal Order of Police is distinguishable from the instant case because no expert testified in that case that the listings were not advertising.  In the instant case, petitioner's expert concluded that, under "generally accepted marketing theory", only 10 percent of the messages in The Constabulary were advertising.  At trial, however, petitioner's expert was asked whether she knew that there was a relationship between the amount of space that a contributor's message received and the amount that was contributed.  Petitioner's expert testified:

> it has just never been made specific and clear.  I
> would assume that * * * because they * * * [petitioner]
> are doing things in gratitude for contributions and I
> would think you would be more grateful for large
> contributions than you would be for small
> contributions.  But I think it really goes to a price
> list and I have never seen one and never heard of one
> and never been told that X amount buys you X space,
> because that would imply advertising.

When presented with an exhibit containing prices for various sized spaces in The Constabulary, petitioner's expert testified: "It looks like a price list to me."

We weigh expert testimony in light of the expert's qualifications as well as all the other credible evidence in the record.  Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).  We are not bound by the opinion of any expert witness, and we will accept or reject that expert testimony when, in our best judgment, based on the record, it is appropriate to do so.  Id., and the cases cited therein.  While we may choose to accept in its entirety the opinion of one expert, we may also be selective in the use of any portion of that opinion.  Id.

We believe that the existence of a quid pro quo arrangement is important to an analysis of whether the displays and listings in The Constabulary constitute advertising.  Because petitioner's expert testified that she did not know that petitioner's contributors were told that there was a relationship between the amount of space a contributor's message received and the amount

that was contributed, we believe that the conclusions of petitioner's expert are based upon incomplete information. Accordingly, we discount the testimony of petitioner's expert.

Petitioner next argues that one factor to be used in determining the existence of "advertising" is the contributor's intent in making a payment to the organization. Petitioner argues that contributors to The Constabulary expected no commercial benefit from their payment but merely intended to benefit petitioner. In its affirmance of our decision in Fraternal Order of Police v. Commissioner, supra, the Seventh Circuit Court of Appeals stated that the sponsor's

> motivation [to help support the families of officers killed in the line of duty] does not define * * * [the Fraternal Order of Police's] activities. To place a listing in The Trooper, each sponsor had to purchase a space and pay a prescribed rate which corresponded to the desired size of the listing. Moreover, each issue of The Trooper included the request by the editors that its readers patronize those who had paid for the listings. [Fraternal Order of Police v. Commissioner, 833 F.2d at 721.]

Accordingly, in the instant case, we conclude that an inquiry into the contributor's intent in making a payment to petitioner is not helpful in light of the fact that the contributors received the displays and listings in consideration of their contribution; i.e., they purchased the display or listing, and the size of the space allotted to the contributor's message was linked to the amount paid. In any event, petitioner has not established in the instant case that the display or listing

received by the contributor had a value less than the amount of the contribution given in exchange for the display or listing. Consequently, we will apply an analysis of the displays and listings similar to the one we used in <u>Fraternal Order of Police v. Commissioner</u>, 87 T.C. 747 (1986), to decide whether petitioner's displays and listings in The Constabulary constitute "advertising".

As in <u>Fraternal Order of Police</u>, the displays in The Constabulary contained the usual elements associated with advertisements such as blocking, illustrations, signatures, trademarks, and emblems. An "Advertisers' Index" contained the name of the sponsor of each display, including McDonald's, AT&T Corp., John Hancock, Sheraton Hotels, and Mobil Oil Corp., among other well-known companies, and specified the page upon which the display was located. Between the displays and the "Advertiser's Index" appeared a section of listings called the Business Directory wherein various businesses were identified by name and classified by type of business, as in the yellow pages of a telephone directory.

We have examined the record and copies of The Constabulary, and we are convinced that both the displays and the listings constitute "advertising". Many of the displays are composed of slogans, logos, trademarks, and other information which is similar if not identical in content, composition, and message to

the listings found in other professional journals, newspapers, and the yellow pages of telephone directories. Additionally, the contracts with BWE and McKnight, petitioner's correspondence, and The Constabulary itself repeatedly use such words and phrases as "advertising", "advertisements", "advertisers", "ad book", and "marketing advertising" to describe the displays and listings and related activities. Consequently, we conclude that the displays and listings in The Constabulary constitute "advertising".

Petitioner next argues that section 1.513-1(b), Income Tax Regs., exempts its solicitation activity from being characterized as a trade or business because its "advertising" is a low-cost article. That regulation addresses charitable fundraising programs where low-cost goods are sent out by organizations along with a solicitation to contribute money. In its sales of advertising, however, petitioner did not follow such a procedure. Additionally, the lowest charge for any of petitioner's displays or listings was, during some of the periods in issue, $55 for a two-line listing in the business directory, a cost that cannot be properly described as "low". Accordingly, we conclude that petitioner is not eligible for the low-cost article exemption.

We next examine whether petitioner's selling of advertising space constitutes an "unrelated trade or business" for purposes of section 512. Generally, the selling of advertising space is an "activity which is carried on for the production of income

from the sale of goods" and is therefore a "trade or business" within the meaning of section 513(c). The Supreme Court has interpreted section 1.513-1(b), Income Tax Regs., as "'fragmenting' the enterprise of publishing into its component parts", segregating "the 'trade or business' of selling advertising space from the 'trade or business' of publishing a journal". United States v. American College of Physicians, 475 U.S. 834, 839 (1986). The trade or business of soliciting, selling, and publishing advertising does not lose identity as a trade or business when the advertising appears in an exempt organization's periodical that contains editorial matter related to the exempt purposes of the organization. Id. (citing sec. 1.513-1(b), Income Tax Regs.).

Accordingly, we segregate the publishing of the editorial matter in The Constabulary from the soliciting, selling, and publishing of advertising space in The Constabulary. Petitioner concedes that the advertising activity is not substantially related to petitioner's exempt purpose. Consequently, we hold that petitioner was engaged in an unrelated trade or business of soliciting, selling, and publishing advertising space.

We next examine whether petitioner's unrelated trade or business was "regularly carried on" within the meaning of section 512. Petitioner argues that its advertising activity was not

regularly carried on. The regulations provide the general requirement:

> In determining whether trade or business from which a particular amount of gross income derives is "regularly carried on," within the meaning of section 512, regard must be had to the frequency and continuity with which the activities productive of the income are conducted and the manner in which they are pursued. * * * [Sec. 1.513-1(c)(1), Income Tax Regs.]

The regulations also provide that "This requirement must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete." Id.

After stating the general principles, the regulations next categorize an exempt organization's business on the basis of its nonexempt counterparts' "Normal time span of activities." Sec. 1.513-1(c)(2)(i), Income Tax Regs. The regulations inquire whether the exempt organization's income-producing activities are of a kind normally conducted by nonexempt commercial organizations on (1) a year-round basis or (2) only a seasonal basis. Id. For "year-round" activities, the regulations provide that "the conduct of such activities by an exempt organization over a period of only a few weeks does not constitute the regular carrying on of trade or business", but that the conduct of such activities "for one day each week would constitute the regular carrying on of trade or business." Id. For "seasonal"

activities, the regulations provide that "the conduct of such activities by an exempt organization during a significant portion of the season ordinarily constitutes the regular conduct of trade or business."  Id.

The regulations provide special rules for "intermittent activities".  Sec. 1.513-1(c)(2)(ii) and (iii), Income Tax Regs. We have previously noted:

> The regulation does not, in terms, define "intermittent".  We gather from the context that an activity is to be regarded as intermittent if it is not conducted by the tax-exempt organization on a year-round basis (or, with regard to an activity that is normally conducted by nonexempt organizations only on a seasonal basis, the activity is intermittent if it is not conducted by the tax-exempt organization for substantially the full season).  * * *  [Veterans of Foreign Wars, Mich. v. Commissioner, 89 T.C. 7, 32 (1987).]

The regulations, apparently equating "intermittent" with "discontinuous" and "periodical", provide that exempt organization business activities "which are engaged in only discontinuously or periodically will not be considered regularly carried on if they are conducted without the competitive and promotional efforts typical of commercial endeavors."  Sec. 1.513-1(c)(2)(ii), Income Tax Regs.  For example, "the publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business."  Id.

Additionally, the regulations provide that "Certain intermittent income producing activities occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be regarded as trade or business regularly carried on."  Sec. 1.513-1(c)(2)(iii), Income Tax Regs.  The regulations add that "such activities will not be regarded as regularly carried on merely because they are conducted on an annually recurrent basis."  Id.

In the instant case, petitioner advances two arguments that its advertising activity is not "regularly carried on" within the meaning of section 1.513-1(c)(1), Income Tax Regs.  Petitioner's first argument is that BWE's and McKnight's activities should not be attributed to petitioner for purposes of determining whether petitioner regularly carried on its trade or business of selling and publishing advertising.  Petitioner relies on NCAA v. Commissioner, 914 F.2d 1417 (10th Cir. 1991), revg. 92 T.C. 456 (1989).  In NCAA, this Court concluded that the publisher's activities should be attributed to the National Collegiate Athletic Association (NCAA) because the NCAA failed to provide evidence regarding the extent and manner of the publisher's conduct in connection with the solicitation, sale, and publication of advertising in the tournament programs.  NCAA v. Commissioner, 92 T.C. at 468.  On appeal, however, the Tenth Circuit Court of Appeals focused instead on the fact that the

programs were distributed over less than a 3-week span at an event occurring only once a year. NCAA v. Commissioner, 914 F.2d at 1421-1424.

In the instant case, petitioner argues that the activities of BWE and McKnight should not be attributed to petitioner. Petitioner argues that its contracts with each publisher provided: (1) That the publisher was an independent contractor and not the agent of petitioner, (2) that petitioner had no direction or control over BWE's personnel or business activities, and (3) that the publisher agreed to "save" petitioner harmless from any liability resulting from the publisher's activities. Petitioner points to the additional fact that the telephone callers were employed by a subcontractor of BWE and McKnight, and petitioner asserts that the subcontractor had complete control over the callers.

In NCAA, this Court found an agency relationship because the contract between the NCAA and the publisher expressly designated the publisher as the NCAA's "exclusive agent" for the sale of advertising in the program, and because the contract manifested an intent (1) that the publisher would act on behalf of the NCAA in conducting the sale of advertising, and (2) that NCAA could control the publisher's activities. NCAA v. Commissioner, 92 T.C. at 467. In the instant case, petitioner's agreements with BWE and McKnight provide that each of the latter

is an independent contractor and as such * * * [petitioner] has no direction and control over the personnel or business activities of * * * [publisher]. * * * [publisher] is not the agent of * * * [petitioner] and shall not incur any expenses, bills, indebtedness or obligations for or in the name of * * * [petitioner] and shall save * * * [petitioner] harmless from any liability whatsoever as a result of * * * [publisher's] business activities.

The manner in which the parties to an agreement designate their relationship is not controlling. Board of Trade v. Hammond Elevator Co., 198 U.S. 424, 437 (1905). A true agency relationship may be established despite the parties' designation to the contrary. See id. at 438 (quoting Connecticut Mutual Life Insurance Co. v. Spratley, 172 U.S. 602, 615 (1899)).

In the instant case, we conclude that the agreements manifested an intent that BWE and McKnight would act on behalf of petitioner in conducting the sale of advertising. The agreements provided that BWE or McKnight (as the case might be) "has full authority to use the good name of * * * [petitioner] during the course of the earnings program." Additionally, the agreements provided a payment collection procedure in which "All checks or money orders received as a result of the solicitation shall only be made payable to * * * [petitioner]." By providing BWE and McKnight with the authority to use petitioner's name and to collect petitioner's solicitation payments, the agreements authorized those companies to act on behalf of petitioner in conducting the sale of advertising.

Additionally, we conclude that petitioner could control BWE's and McKnight's activities.  The agreements provided:

> [petitioner] shall have the right to inspect any field offices or other offices from which the solicitation program is taking place without prior notice and at any time so as to determine whether or not * * * [BWE or McKnight] is fulfilling its obligations under this AGREEMENT.

Petitioner reserved the right "to exempt at any time any subscriber or any prospective subscriber or advertiser for any reason whatsoever."  BWE or McKnight had a duty to provide each Monday a copy of the daily reports for the previous week of all collected funds.  Accordingly, we conclude that petitioner could and did control BWE's and McKnight's activities.  In the instant case, we are convinced that neither the compensation structure, which shifted part of the risk of loss to BWE and McKnight, nor the presence of the indemnification clause in favor of petitioner negates the agency relationship.  Accordingly, we conclude that petitioner had an agency relationship with BWE and with McKnight, and that BWE's and McKnight's activities, as well as those of their subcontractors, are to be attributed to petitioner for purposes of determining whether petitioner's trade or business of soliciting, selling, and publishing advertising space was "regularly carried on" within the meaning of section 512.[5]

---

[5]     Compare <u>Fraternal Order of Police v. Commissioner</u>, 87 T.C. 747 (1986), affd. 883 F.2d 717 (7th Cir. 1987), where an exempt organization, having contracted with another entity to publish a
(continued...)

Citing <u>Suffolk County Patrolmen's Association v. Commissioner</u>, 77 T.C. 1314 (1981), petitioner next argues that the time and effort spent in the solicitation of advertising for The Constabulary should not be considered in deciding whether its trade or business is regularly carried on. Petitioner points to our conclusion in that case that "nowhere in the regulations or the legislative history of the tax on unrelated business income is there any mention of time apart from the duration of the event itself." <u>Id.</u> at 1323. Petitioner also points to the opinion of the Tenth Circuit Court of Appeals in <u>NCAA</u> that the basketball tournament "must be considered the actual time span of the business activity sought to be taxed here". <u>NCAA v. Commissioner</u>, 914 F.2d at 1423.

Petitioner argues that, even if BWE's and McKnight's activities are attributed to petitioner, the mere employment of an independent commercial firm does not itself render the trade or business "regularly carried on" within the meaning of section 1.513-1(c)(1), Income Tax Regs. Finally, petitioner argues that its intermittent activities were not conducted with the

---

[5](...continued)
magazine and to sell advertising space therein on its behalf, was found to be an active participant in the publication of the magazine because it could appoint the executive editor, prepare editorials and feature articles, oversee and control solicitations of business listings, and control the bank account and the reprint of articles.

competitive or promotional efforts typical of commercial
endeavors.

We conclude that the facts of Suffolk County and NCAA are
distinguishable from those of the instant case. In Suffolk
County, although a large percentage of the organization's annual
vaudeville shows' gross receipts derived from the sale of
advertising for the shows' program guides, we defined the
taxpayer's trade or business for purposes of section 513 as the
annual vaudeville shows.[6] Suffolk County antedated United States
v. American College of Physicians, 475 U.S. 834 (1986). In
Suffolk County, we did not segregate the business of the annual
vaudeville shows from the publishing of the shows' program
guides, nor did we segregate the publishing of material relating
to the shows from the business of selling and publishing
advertising space in the program guides. Accordingly, we
conclude that Suffolk County is not dispositive of the instant
case.

In NCAA, the Tenth Circuit Court of Appeals defined the
taxpayer's trade or business for purposes of section 513 as "the

---

[6]    See Suffolk County Patrolmen's Association v. Commissioner,
77 T.C. 1314, 1319 (1981) ("Although petitioner does dispute that
the annual vaudeville show constituted a trade or business, its
primary argument herein is that even if the show was a trade or
business it was not 'regularly carried on.'"); id. at 1322 n.10
("Respondent maintains, and we agree, that the actual performance
of the vaudeville show and the solicitation of advertising for
the program guide are a single inseparable activity.").

publication of advertisements in programs" during the time span of the basketball tournament. NCAA v. Commissioner, 914 F.2d at 1423. In contrast, the facts in the instant case show that petitioner's solicitation, sale, and publishing of advertising space was undertaken apart from any discrete event or show with a limited, specified duration.

Although petitioner argues that publication of The Constabulary was tied to the State Police Chase, an annual, 1-day sports event,[7] it did not object to respondent's proposed finding of fact that "During the years in issue, The Constabulary was not arranged as a program guide for the annual 'State Police Chase' sporting event." Additionally, based upon our own review of The Constabulary, we conclude that it was not a program for the State Police Chase, which was mentioned in only the 1989, 1990, and 1991 editions. In The Constabulary for each of those years, the State Police Chase of the prior year was profiled in a two- or three-page article. Accordingly, we conclude that The Constabulary was not tied to a sports event and that section 1.513-1(c)(2)(ii), Income Tax Regs., therefore does not apply to the instant case. Consequently, NCAA is distinguishable from the facts of the instant case.

_____

[7] As we have stated, supra p. 28, sec. 1.513-1(c)(2)(ii), Income Tax Regs., provides that "the publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business."

In the instant case, we have held, supra p. 26, that petitioner's unrelated trade or business for purposes of section 513 was soliciting, selling, and publishing advertising space. The advertising business is an income-producing activity "of a kind normally conducted by nonexempt commercial organizations on a year-round basis". Sec. 1.513-1(c)(2)(i), Income Tax Regs. In deciding whether petitioner's business was "regularly carried on" within the meaning of section 512 and the regulations thereunder, we examine all activities of petitioner's advertising "trade or business", which include soliciting, selling, and publishing commercial advertising. United States v. American College of Physicians, supra at 839 (citing sec. 1.513-1(b), Income Tax Regs.).

We have concluded, supra pp. 30-31, that the activities of BWE and McKnight and their subcontractors are to be attributed to petitioner for purposes of determining whether petitioner's business was "regularly carried on". Through those entities, petitioner conducted a solicitation program 8 hours a day for approximately 46 weeks a year. Petitioner distributed The Constabulary once each year at the State Police Chase, hand-carried approximately 1,000 copies to troopers' barracks over the span of a couple of weeks, and delivered the remaining copies to businesses. We conclude that such activities are sufficiently frequent and continuous to be characterized as "regularly carried

on" within the meaning of section 1.513-1(c)(2)(i), Income Tax Regs.

We have considered all remaining arguments of petitioner concerning the unrelated business income issue and find them to be without merit. Based on the record in the instant case, we conclude that all the elements of sections 512 and 513 and section 1.513-1(a), Income Tax Regs., have been met. Consequently, we hold that petitioner is liable for unrelated business income tax on its advertising income.

Additions to Tax

Respondent determined in the notice of deficiency that petitioner is liable for additions to tax pursuant to sections 6651(a)(1), 6653(a)(1) and (2), 6653(a)(1)(A) and (B), and 6661(a), and penalties pursuant to section 6662(a), for certain taxable periods in issue. The instant case involves a complex and close question of law. See Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 661 (1987); Belz Inv. Co. v. Commissioner, 72 T.C. 1209, 1233 (1979), affd. 661 F.2d 76 (6th Cir. 1981). Although we have distinguished Suffolk County Patrolmen's Association v. Commissioner, 77 T.C. 1314 (1981), we conclude that the case provided petitioner with substantial authority for its tax treatment of income from The Constabulary and that petitioner's reliance on the case was reasonable under the circumstances, considering the fact that this area of the law

was developing during the periods in issue.  Additionally, we conclude that petitioner reasonably relied on the advice of its counsel that it need not file Forms 990-T for the periods in issue.  Accordingly, we hold that petitioner is not subject to the additions to tax or penalties for any of the taxable periods in issue.

     To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>